**R. J. BRYAN, Plaintiff-Appellee,**

v.

**BROCK & BLEVINS CO., INC., et al.,**
**Defendants-Appellants.**

No. 72–3601.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1974.

Rehearing and Rehearing En Banc
Denied April 16, 1974.

---

9. Defendants were not charged under 18 U.S.C. § 922(i) for interstate transportation of a stolen gun.

Charles J. Gearhiser, Chattanooga, Tenn., George Paul Shaw, Lafayette, Ga., for defendants-appellants.

Frank M. Gleason, Rossville, Ga., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal raises the question whether the Georgia Merger Statute, Section 22–1001 et seq., including the right of the merged corporation to eliminate a dissenting stockholder upon an appraisal and acquisition of his stock, can be used solely for the purpose of "freezing out" a minority dissenting stockholder.

Jurisdiction in the United States District Court was obtained by virtue of the filing of a complaint in which the plaintiff alleged specific violations of the requirements of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10(b)(5) of the Securities & Ex-

change Commission. The complaint also alleged, however, that the manner in which the defendants attempted to utilize the Georgia Corporation Merger Statute was, in and of itself, a "device, scheme and artifice to defraud" which the plaintiff, as the holder of a 15% stock interest in the merged corporation could enjoin. Pendent jurisdiction attaches to the second claim and permits the court to consider it independently of the provisions of the Securities Exchange Act, even though jurisdiction of the court was not alleged on diversity grounds.[1]

The absence of any claim here by the appellant that there was not sufficient evidence upon which the trial court could make its conclusion that "the sole purpose and intent of the organization of Power Erectors and the proposed merger was the elimination of the plaintiff" and that "the proposed merger itself was a course of business which would operate as a fraud or deceit upon Bryan, in connection with the sale of his stock," [2] enables us to repeat some of the findings of the trial court which set out the circumstances leading up to the transaction that is here under attack.

## FINDINGS OF FACT

Brock & Blevins Co., Inc., (hereinafter Brock & Blevins), was incorporated in 1950 as a Georgia corporation having its principal place of business in Rossville, Walker County, Georgia. Prior to 1950, Brock & Blevins had operated as a partnership. The business of Brock & Blevins was the manufacture of machinery of all kinds; the maintenance, operation and conducting of foundaries and foundry business; the maintenance and operation of machine shops, and assembly plants; the business of assembling and erecting power plants, chemical plant equipment and other heavy machinery of any kind, character or description; engaging in the general

steel and iron construction business; and the carrying on of a general industrial service and erection of all kinds of iron construction and industrial service. The original stockholders of Brock & Blevins were J. A. Brock, W. G. McGlothlin and H. E. Shrader.

Robert J. Bryan, [the plaintiff in this action] a chemical engineer with a Bachelor of Science Degree from the University of Wisconsin, was employed by Brock & Blevins in 1955. Bryan's position with the company at that time was varied in that he was working on special problems, following up sales and contracts, and traveling. He maintained this status with the company for some two and one-half years at which time he was appointed General Manager on June 13, 1957. Bryan began serving on the Board of Directors of Brock & Blevins in 1960 and was elected to the office of Executive Vice-President in that same year. Bryan served on the Board of Directors and as an officer of the company from 1960 until his resignation on October 17, 1970. Bryan's resignation was predicated upon a severe problem in company management, and he felt that his termination as an active employee in the management of Brock & Blevins was for the best interest of the company's future. Bryan has retained his status as an inactive stockholder in the company up to the time of the threatened merger in December, 1971, of Brock & Blevins with Power Erectors, Inc.

The present company management maintains that there is a long-standing company policy of Brock & Blevins having only "active employees" as shareholders. They have used this policy to support the instigation of the threatened merger which is the foundation of this controversy. Asserting the existence of this company policy, the defendants have made vari-

1. There was not complete diversity as to the individual parties. Nor was the jurisdictional amount alleged.

2. The appellants challenge the correctness of the conclusions, but they do not attack specifically any of the historical facts recited below.

ous attempts to acquire Bryan's stock by what they describe as a "fair value" offer.

\*   \*   \*   \*   \*   \*

Bryan was then contacted in May of 1971 by Judge Painter who initiated his interest in purchasing the stock. Bryan responded with a willingness to discuss the matter, but a formal meeting was never arranged. During this same interval of Judge Painter's correspondence, Bryan was contacted by Bill Hicks, an individual non-employee, who also expressed an interest in purchasing the stock. This expression of interest also failed to materialize.

Bryan was first approached with a value offer on August 21, 1971, during a luncheon engagement in Chattanooga with Judge Painter. Judge Painter conveyed an offer of $200,000 for the stock on the premise that he was the representative for the other "stockholders." Bryan's reaction to the offer was that the price was too low, and Judge Painter responded by saying that he was authorized to offer only $200,000 and that he could not negotiate further.

Bryan was not approached again until November 16, 1971, at which time Frost and Frost, Certified Public Accountants for defendant Brock & Blevins, acting through a partner, Jim Frost, called plaintiff to come to his office to discuss "a problem." It was related that W. G. McGlothlin, president of Brock & Blevins, had engaged a Chattanooga law firm concerning this matter. A meeting was scheduled for November 18, 1971, at the offices of Frost & Frost. This meeting was attended by Sydney W. Carpenter, Attorney for the law firm of Stophel, Caldwell & Heggie of Chattanooga, representing Brock & Blevins; James B. Frost, Certified Public Accountant for Brock & Blevins; and Mr. and Mrs. R. J. Bryan. Carpenter informed Bryan that the "stockholders" wanted to buy his stock, but in so doing, they intended a fair treatment of Bryan. At the meeting, Bryan was

given an appraisal prepared by Mr. Daniel W. Lattimore, an S.R.A. and M.A.I. appraiser and real estate consultant from Chattanooga, together with a number of analyzed reports, audits and balance sheets as an indication of Brock & Blevins' past economic history. Included within these documents was an unaudited calculation of the estimated progress of the company through June 30, 1971. Carpenter then submitted to Bryan two alternate offers, one of which would have to be accepted by noon on Monday, November 22, 1971. The offers were:

(1) Two Hundred Ninety Thousand ($290,000) Dollars cash for his stock or,

(2) Two Hundred Thousand ($200,000) Dollars cash for his stock, plus another Two Hundred Thousand ($200,000) Dollars over a ten-year period in return for an agreement not to compete with Brock & Blevins for the same ten-year period.

Carpenter stated that his law firm had advised McGlothlin that *fundamental corporate changes would be necessary in order to acquire Bryan's stock if he refused to accept one of the offers, and the necessary legal proceedings would begin immediately upon such refusal.* Bryan was fully apprised of the contemplated merger plan which would find him a dissenter and qualified *to receive only appraisal remedies under the 1969 Georgia Corporation Statutes.* Carpenter advised Bryan that the proposed merger plan would not be carried out if one of the two offers was accepted within the allowable time period. (Emphasis added).

On November 19, 1971, Bryan called Frost to clarify whether or not the two offers were presented as an ultimatum, and Frost advised Bryan that the offers and deadline were intended as such. On November 22, 1971, Bryan let the deadline pass without a decision. Frost called Bryan and asked if a decision had been reached,

and Bryan responded in the negative. Frost relayed the message to Carpenter, and on November 23, 1971, Carpenter called Bryan with an offer for more time in which to contemplate a decision. Bryan stated that such a time period would still be far too short and again contended the offer was far below the true value of the stock; and furthermore, he advised that he did not want to sell his stock. Carpenter then advised Bryan that appropriate legal proceedings would commence immediately.

On November 26, 1971, Judge Painter, a member of the Board of Directors of Brock, approached Bryan, "as his friend," in order to admonish Bryan of the probable expenses to be realized when seeking the professional advice of an attorney in a situation of this nature.

On November 29, 1971, the "active" shareholders of Brock & Blevins entered into an agreement to form a new corporation, Power Erectors, Inc. Pursuant to the agreement, all shareholders in Brock & Blevins, except Bryan, exchanged their stock holdings in Brock & Blevins for a proportionate amount of stock in Power Erectors, Inc. As a result of that exchange, Power Erectors, Inc. became the owner of 85 percent of the stock in Brock & Blevins and Bryan remained as the owner of 15 percent of the stock. The initial Board of Directors of Power Erectors, Inc. was, W. G. McGlothlin, Paul W. Painter, J. E. Wright, N. A. Dunn and J. J. Underwood. W. G. McGlothlin was the incorporator and majority stockholder in Power Erectors, Inc. There were no preemptive rights in that company. On November 30, 1971, Power Erectors, Inc. was duly incorporated under the Georgia corporation statutes having its principal place of business in Rossville, Walker County, Georgia.

On December 2, 1971, upon waiver of notice, a special meeting of the Board of Directors of Power Erectors, Inc. was held in Rossville, Georgia. As chairman of the meeting, W. G. McGlothlin stated that the purpose of the meeting was to consider recommending to the shareholders of the company a plan of merger whereby Brock & Blevins would be merged into Power Erectors, Inc. Upon motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED, that the Board of Directors of Power Erectors, Inc. recommend to its shareholders that Brock & Blevins Co., Inc. be merged into Power Erectors, Inc. in accordance with the plan of merger which was presented and reviewed at this meeting; and

FURTHER RESOLVED, that the secretary of his corporation be, and hereby is, instructed to give notice in accordance with law of a special meeting of the shareholders of Power Erectors, Inc. to consider this plan of merger, such meeting to be held at 316 Chickamauga Avenue, Rossville, Georgia, on December 22, 1971, at 10:00 A.M.

Under the plan of merger, the stock owned by Power Erectors, Inc. in Brock & Blevins would be cancelled and Bryan would receive $290,000 for his stock.

On December 2, 1971, a notice of the December 22, 1971, shareholders meeting of Brock & Blevins was mailed to Bryan and was received by him on December 3, 1971. Included in the notification were several reports and audits of Brock & Blevins' past economic history. It was reported in the notice that the 1971 profit and loss report of Brock & Blevins was included, when in fact the year had not ended. A highly contested factual dispute exists as to whether this indication was an error or an intentional act of fraudulent misrepresentation. The Court finds that it was a false statement, whether intended as such or not.

The plaintiff has alleged that the "plan of merger" is a device, scheme and artifice to defraud him of his sta-

tus as a shareholder in an existing corporation. It is alleged that this is a violation of the Securities and Exchange Act and the General Rules and Regulations of the Securities and Exchange Commission, and this suit is instituted for the purpose of permanently enjoining the proposed merger of the two corporations.

The applicable part of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

■ We agree with the trial court that the proposed transaction whereby, under the Georgia Corporation Merger Statute, Bryan could be forced to surrender his stock to the corporation in return for cash at an appraised value amounts to a "sale" under this Act. Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (5th Cir. 1971).

The trial court found as a fact that there were two false statements made by the defendant corporation Brock & Blevins Co., Inc. and its officers. The first of these was the statement contained in the letter delivered to Bryan to the effect that the financial statement for the year 1971 was enclosed. There was no 1971 financial statement, and there could be none, since the letter was delivered in November and the year would not end until December 31st. The other was a failure to inform Bryan of the present posture of certain negotiations Brock & Blevins was carrying on with respect to a potential acquisition of one or two additional companies. The trial court found that these two omissions gave right to a claim under the Securities Act because they were used in connection with the sale of a security. Both the findings of fact that these elements were false and the applicability of section 78j(b) are challenged by the appellants. Because of the disposition we make of the case it is not necessary for us to resolve these issues.

Rule 10b–5 of the Commission, 17 C. F.R. 240.10b–5 (1964), provides:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . .

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The trial court concluded that the acts of the defendants in setting up a second corporation solely for the purpose of enabling them to utilize the Georgia Corporations Merger Act[3] as a means to

3. "The manner and basis of converting the shares of each merging corporation into shares or other securities or obligations of the surviving corporation and, if any shares of any of the merging corporations are not to be converted solely into shares or other securities of the surviving corporation, *the amount of cash* or securities of any other corporation, or combination of cash and such securities, which is to be paid or delivered to the holders of such shares in exchange for or upon the surrender of such shares, *which cash* or securities of any other corporation, or combination of cash and such securities, *may be in addition to or in lieu of the shares or other securities of the surviving corporation.* (Emphasis supplied)." Ga.Code Ann. § 22–1001(b)(3).

"Upon filing a notice of election to dissent, the shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares. . . ." Ga.Code Ann. § 22–1202(d).

"The enforcement by a shareholder of his

force Bryan, as a dissenting stockholder, to lose his stock interest in the resulting corporation was "a device, scheme, or artifice to defraud Bryan of his stock." The appellants contend that "under these provisions of the Georgia merger statutes, a minority shareholder may be required to accept cash in full payment for his shares in the merging corporation." We agree that this is the purport of the Georgia statute, which is based on section 623 of the New York Business Corporation Law, McKinney's Consol. Laws, c. 4. Appellants contend that the trial court's determination that "the proposed merger itself was a course of business which would operate as a fraud or deceit upon Bryan, in connection with the sale of his stock" amounted in effect to a holding that "the proposed merger pursuant to Georgia merger statute was a violation of federal securities law *per se*." Of course, the trial court did not decide any such thing. It decided that where a corporation is unable, because of well recognized contract law to eliminate a minority stockholder by simply adopting a by-law or voting to purchase his stock, its majority stockholders cannot accomplish the same purpose by setting up a second corporation wholly owned by them whose sole purpose is to enable it to take advantage of the merger statutes which, when utilized by two existing corporations, may, as a part of the merger procedures result in the elimination of a dissenter.

There is little law on this subject, although similar efforts by corporations to eliminate minority interests by the majority vote to liquidate a corporation followed by acquisition of the going business by the same persons who hold the majority stock ownership have been subject to considerable litigation.

In Lebold v. Inland Steel Co., 125 F.2d 369 (7 Cir. 1941) the court held that the plaintiffs, minority stockholders of the Inland Shipping Company, could recover damages incurred by him by reason of acts of the defendant Inland Steel Company, controlled by common directors and officers, in dissolving the steamship company, buying its assets and appropriating its business. The theory of plaintiffs was that the defendant, owning some 80% of the stock of the steamship company had so utilized its prominent position as majority stockholder as to force the latter company out of a prosperous going business, to bring about its dissolution and to take over its property and its business to the detriment of plaintiffs. The trial court dismissed the complaint. In reversing that action the Court of Appeals said:

"What defendant might have accomplished under color of the West Virginia statute was discontinuance of the business. What it did, was to take, through form of a sale, the physical assets and the entire business of the Steamship Company. Whether we stamp the happenings as dissolution or with some other name, equity looks to the essential character and result to determine whether there has been faithlessness and fraud upon the part of the fiduciary. However proper a plan may be legally, a majority stockholder cannot, under its color, appropriate a business belonging to a corporation to the detriment of the minority stockholder. The so-called dissolution was a mere device by means of which defendant appropriated for itself the transportation business of the Steamship Company to the detriment of plaintiffs. That the source of this power is found in a statute, supplies no reason for clothing it with a superior sanctity, or vesting it with the attributes of tyranny. Allied Chemical & Dye Corp. v. Steel & Tube Co. of America, 14 Del. [Ch.] 1, 120 A. 486. The books are full of instances

right to receive payment for his shares in the manner provided in this section shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share owner-

ship, except as provided in subsection (d) of this section, and except where the corporation by fraud has induced the shareholder to enforce his dissenter's rights." Ga.Code Ann. § 22–1202(j).

of disapproval of such action. If it be an absorption by the dominant member of all the returns of the corporate investment, or a sale of the property to oneself for an inadequate consideration, or deprivation by a syndicate formed to freeze out a minority stockholder through sale and dissolution or if the buyer and seller are the same, the right of a stockholder to vote becomes a power in trust when he owns the majority and assumes and exercises domination and control over corporate affairs. Such majority stockholders' vote 'must not be so antagonistic to the corporation as a whole as to indicate that their interests are wholly outside of the interest of the corporation and destructive of the interests of the minority shareholders.' " (citations omitted).

The case of Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) is also instructive. It was largely relied upon by the court in the *Lebold* case, *supra*. Speaking of the dominent stockholder or majority, the Supreme Court said in *Pepper*:

"He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandisement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation."

The trial court here simply held that the dominant stockholder interests in this case utilized the Georgia Corporation Merger Statute to accomplish something that they could not accomplish directly. The finding was to the effect that a new corporation was set up, hav-ing no business purpose of its own and no pre-existing viability of any kind, solely for the purpose of effecting a "freeze-out," which Professor Vorenburg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv. L.Rev., 1189 (1964), describes by saying:

"For our purposes, the nub of the problem is that an absolute freeze-out right would mean that those in control rather than the stockholder himself would decide when he shall sell his stock."

It was with this concept in mind, that the trial court found the absence of a "business purpose" for the proposed merger of Brock and Blevins into Power Erectors. In the absence of such business purpose Power Erectors was purely a sham party created to circumvent the rule of law that prohibits a majority of stockholders of a corporation, absent any charter provision as to the contrary, to force the minority interests to surrender their stock holdings. Implicit in this holding was a construction of the Georgia statute that comports with equity in good conscience. Such construction would read out of the statute a situation where there was no pre-existing corporation to be merged, but instead where such corporation was created solely for the purpose of accomplishing an illegal result. Such construction is clearly warranted by the language quoted above from *Pepper*:

"He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements."

The trial court used this determination to permit it to conclude that there had been a violation of the Securities Exchange Act and the regulations promulgated by the Securities & Exchange Commission. The court held that such a procedure "was a course of business which would operate as a fraud or deceit upon Bryan, in connection with the sale of his stock."

Appellants contend that whatever the plan of procedure was, it did not fall within the prohibitions of the law because it had nothing to do with enabling the dissenting stockholder to consider or decide or make any commitment with respect to the sale of stock. In our opinion, this is a close question which we do not have to decide.

In the complaint, Bryan alleged specifically that this procedure is a "device, scheme and artifice to defraud," and further, "such plan was adopted by the directors in rubber stamp approval of Mr. McGlothlin's plan and solely as a device to confiscate plaintiff's investment at less than its true value, after he refused to sell at the price offered to him by McGlothlin." Further the complaint alleged, "Every plan of merger authorized by Georgia law (Code Annotated 22–1001) contains an implied condition that the parties to it will act in good faith and deal fairly with each other in adopting such plan," and then further:

> Because the Board of Directors of Brock and Blevins Co., Inc. adopted such resolution to merge said corporations for the sole purpose of confiscating plaintiff's property, the plan itself is a fraud and because such sham merger constitutes a manipulative and deceptive device and contrivance in violation of the rules and regulations of the Securities & Exchange Commission, the adoption of the plan of merger by the shareholders should be enjoined by this court.

■ Regardless of whether the device, found by the court to be fraudulent as against the plaintiff, was a violation of the Securities Exchange Act, it was clearly a violation of the plaintiff's rights under state law. While neither party cites a single Georgia case, we have no doubt that the pronouncements contained in the Court of Appeals decision from the Seventh Circuit, and the Supreme Court decision referred to above, clearly state the local law to be applied by a federal district court in equity.

■ As stated at the outset, jurisdiction was acquired by the allegations relating to the violations of the Securities Exchange Act. These allegations presented a serious and material question for the court to decide. Any equitable cause of action that would lie under the same proof and the same findings of the trial court can properly be adjudicated under the district court's pendent jurisdiction over a state cause of action. We think that the case so clearly establishes the right of the plaintiff to the relief granted by the trial court under general principles of corporation law, which we have discussed above, that we pretermit a determination as to whether the trial court correctly related the misuse of the Georgia statute to the Securities Exchange law, and approve the decision on the basis of general equity and state law grounds. See, on the question of resort to compulsory appraisal for the purpose of "freezing out" a minority stockholder, 77 Harv.L.Rev., 1189 (1964) *supra.*

This disposition of the case also makes it unnecessary for us to determine whether there were adequate grounds for the trial court's determination that there were two other violations of the Securities Exchange Act. The evidence was conflicting as to both, but a question remains as to whether the actions of Bryan, who was "under the gun" to dispose of his stock by virtue of an entirely different set of circumstances (the merger gambit) could in any way have been affected or influenced by such conduct by the defendants. We do not reach this issue but it may be that the plan to create a sham corporation to effect a merger really undercut whatever had happened before. The relief which we conclude the plaintiff is entitled to because of this situation is full and complete, and we think it therefore unnecessary to deal with the other question as to violations of Section 10(b) or the supplementary regulations.

The judgment of the trial court is affirmed.