Louis S. SINGER and Mollie Singer, Plaintiffs,

v.

The MAGNOVOX COMPANY et al., Defendants.

Court of Chancery of Delaware, New Castle.

Submitted May 26, 1976.

Decided Oct. 26, 1976.

Steven J. Rothchild and David B. Ripsom of Prickett, Ward, Burt & Sanders, Wilmington, and Kohn, Savett, Marion & Graf, Philadelphia, Pa., for plaintiffs.

David A. Drexler, Richard L. Sutton and William C. Anderson of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

BROWN, Vice Chancellor.

This suit was brought by two residents of Pennsylvania who claim to have been shareholders of the defendant, The Magnavox Company ("Magnavox"), at all relevant times up to the merger of Magnavox with a subsidiary corporation of the defendant North American Philips Corporation ("North American"). Their complaint asks that the merger be nullified and rescission directed as to all steps taken in furtherance or consummation thereof. Plaintiffs purport to bring their suit on their own behalf and as a class action on behalf of all persons other than the defendants who owned common stock of Magnavox on July 23, 1975, the day before the merger in issue. They also seek to recover on behalf of themselves and the aforesaid class of persons such damages as have been sustained together with costs and counsel fees.

■ Defendant have moved to dismiss the complaint on the grounds that it fails to state a claim upon which relief can be granted. They have also moved for alternative relief in the event the motion to dismiss is denied. The parties have supplemented the record by stipulating to certain facts which are to be considered encompassed within the allegations of the complaint. These facts together with the stated allegations of the complaint must therefore be accepted as true for the purpose of determining the issues presented by the motion to dismiss. In summary, the pertinent facts may be stated as follows.

Magnavox is a Delaware corporation as is North American. Magnavox is engaged in the manufacture and sale of consumer, defense and industrial products. In addition to its well-known position in the field of home entertainment products it also manufactures accessories for the mobile home and recreational vehicle industries, furniture, musical instruments, and government and industrial electronic products. The vast majority of the business of North American is comprised of the manufacture and sale of electronic products, including lighting and electrical products, electronic components, communication, information and data systems, home entertainment consumer electronic products, and home appliances.

The defendant North American Philips Development Corporation ("Development") was organized as a wholly-owned subsidiary of North American for the purpose of

effecting a tender offer for the shares of Magnavox during August, September and October, 1974. Development has engaged in no business activities other than holding the shares of Magnavox thereafter acquired.

On August 28, 1974, Development tendered of *all* of the shares of common stock of Magnavox at a price of $8.00 per share. Among other things, Development's offer advised Magnavox shareholders as follows:

"Since [North American's] ultimate purpose is to acquire the entire equity interest in [Magnavox], in the event all Shares are not acquired pursuant to the Offer, after the expiration or termination of the Offer and depending upon the number of Shares it has purchased and the information it has received concerning [Magnavox], [North American] will consider whether to acquire the remaining Shares through open market purchases, through a tender or exchange offer, or by any other means deemed advisable by it or whether to propose *a merger,* a sale or exchange of assets, liquidation or some other transactions regarding [Magnavox]. Any such purchases or transactions may be on terms different from those of this Offer and may include the payment of more or less cash or the exchange of securities." (Emphasis added.)

The following day the Magnavox board of directors met and decided to oppose the tender offer. On August 30, 1974, Magnavox issued a letter to its shareholders advising that it was shocked at the inadequacy of the $8.00 per share offer in relationship to a book value in excess of $11.00 and at the fact that the offer was made unilaterally without benefit of negotiation.

During the first week of September 1974, the complaint continues, Magnavox, North American and Development, through the individual defendants and other representatives conspired to settle and compromise their differences for the benefit of the defendants and at the expense of Magnavox stockholders as a result of which (1) Development increased its tender offer to $9.00 per share, (2) Magnavox, at the request of North American and Development, entered into two-year employment contracts at their then salaries with 16 officers of Magnavox, including certain of the individual defendants named herein, and (3) Magnavox withdrew its prior objections to the tender offer.

As a result of the then unopposed tender offer, Development proceeded to acquire 14,967,249 shares, or approximately 84.1% of the outstanding stock of Magnavox. At the time, the per share tender price was several dollars above the market price for Magnavox stock. Subsequently, on May 8, 1975, North American, through Development, caused another Delaware corporation, T.M.C. Development Corp. ("T.M.C."), to be organized as a wholly-owned subsidiary of Development. T.M.C. was organized for the sole purpose of merger with and into Magnavox.

The respective managements of Magnavox, North American and Development then agreed upon the merger of T.M.C. into Magnavox and, on or about June 27, 1975, caused a notice of a special meeting to be sent to the stockholders of Magnavox accompanied by a proxy statement advising, among other things, that upon consummation of the merger each shareholder other than the defendants would receive $9.00 in cash for each share of Magnavox held and would thereafter possess no other interest or right as a shareholder of Magnavox; that only a majority vote was required to approve the merger and that Development, owning 84.1% of the stock, would vote in favor of the merger thus assuring its approval; that the book value of Magnavox common on March 31, 1975 was $10.16; and that the public minority shareholders had the alternative of accepting the merger price offered or seeking payment of the appraised value of their shares pursuant to 8 Del.C. § 262.

On July 24, 1975, the special meeting of shareholders was held and the merger approved, with Development voting its shares in favor thereof.

As of the date on which the merger was proposed as well as voted upon, a working majority of Magnavox's nine-man board of directors consisted of four individuals (defendants Vink, Dettmer, Boling and Leinbach) who were also directors of North American and of three individuals (defendants DiScipio, Minahan and Schrey) who had entered into two-year employment contracts with Magnavox at the request of North American and Development and who each had received an option, effective on the date of the merger, to purchase 5,000 shares of the common stock of North American. Thus at the time Magnavox was controlled by directors who were controlled by Development and North American.

The proxy materials were prepared and mailed from New York City to some 25,000 Magnavox stockholders throughout the United States and abroad, including some 75 stockholders residing in Delaware. The proxy itself requested that it be returned to New York. The proxies so returned, however, were brought physically into Delaware for the July 24 shareholders' meeting. After the merger stockholders were requested to submit their certificates to New York for cancellation and payment checks were mailed from New York to the resident address of the stockholder.

Based upon these facts the relief requested by the complaint is premised on allegations which can be broken down into three categories. First, it is charged that the merger was not designed to serve any valid corporate purpose or compelling business need of Magnavox but rather it was intended solely to remove the public minority shareholders from equity participation in Magnavox at a grossly inadequate price so as to enable North American, through Development, to obtain sole ownership of the business and assets of Magnavox. As such, the merger is said to be fraudulent.

Second, based upon the verbatim allegations of the complaint set forth in the second section hereafter, it is charged that the defendants violated the anti-fraud-provisions of the Delaware Securities Act (specifically 6 Del.C. § 7303) by disseminating a false and misleading proxy statement in connection with the merger.

Third, it is charged that the defendants, as majority shareholders and directors, breached the fiduciary duty they owed to the minority shareholders by recommending approval of the merger at a cash price per share to the minority which they knew to be grossly inadequate. I will deal with each of these allegations in the order set forth.

I. *The Allegation That The Merger Lacked Any Valid Purpose That Would Benefit Magnavox*

■ The motion to dismiss concedes for the purpose of the present determination that the merger of T.M.C. into Magnavox served no corporate purpose of Magnavox and was accomplished solely to rid Development, and thus North American, of the minority shareholders of Magnavox. Defendants point out that what they have done is expressly authorized by 8 Del.C. § 251 and that they have fully complied with this merger statute in all respects. Indeed the complaint does not challenge compliance with the statute.

Plaintiffs charge, however, that under our precedents it is well established that directors and majority shareholders stand in a fiduciary relationship to minority shareholders and, as such, they may not be permitted to unfairly manipulate corporate machinery so as to injure the minority even when the action taken is in technical compliance with the corporate charter or the governing statute. *Bennett v. Breuil Petroleum Corp.*, 34 Del.Ch. 6, 99 A.2d 236

**1354**

(1953); *Condec Corporation v. Lunkenheimer Company*, Del.Ch., 230 A.2d 769 (1967); *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971); *Petty v. Penntech Papers, Inc.*, Del.Ch., 347 A.2d 140 (1975). In fact, Chancellor Seitz stated as a preliminary premise in *Bennett v. Breuil Petroleum Corp.* that "action by majority stockholders having as its primary purpose the 'freezing out' of a minority interest is actionable without regard to the fairness of the price." 99 A.2d 239. Plaintiffs urge that this judicial tendency to protect minority shareholders even in the face of literal compliance with the law by those in control of corporate affairs should be extended to a situation such as the one presented here and that consequently, where the majority concedes that its sole intention in effecting the merger is to eliminate the minority entirely, compliance with the statute in so doing should not automatically constitute a defense. Consequently, they contend that a cause of action is stated.

Defendants correctly point out, however, that none of the foregoing authorities involved a merger. In *Breuil* the Court was considering a potentially diluting issuance of stock to the majority. In *Condec* it was faced with the issuance of additional stock so as to perpetuate control. *Schnell* involved the shifting of the date of the annual shareholders meeting to inhibit the ability of a dissident shareholder to wage a proxy contest. And *Petty* involved an attempt to selectively redeem preferred stock so as to insure continued control by management.

■ In addition, it is well established that the various provisions of the Delaware General Corporation Law are deemed to have independent legal significance, *Orzeck v. Englehart*, Del.Supr., 41 Del.Ch. 371, 195 A.2d 375 (1963), and that a result prohibited by action attempted under one section of the law may be entirely permissible when accomplished through the authorization of another. In fact, in *Federal United Corporation v. Havender*, Del.Supr., 24 Del.Ch. 318, 11 A.2d 331 (1940) the Supreme Court reversed the holding of this Court and held that although accumulated unpaid dividends on preferred stock could not be affected by amendment of the corporate charter, a merger which accomplished the same result was proper. Significantly, the Chancellor had frowned upon this obvious purpose of the merger, stating as follows at *Havender v. Federal United Corp.*, 23 Del.Ch. 104, 2 A.2d 143, 147 (1938):

"I am of the opinion that *the merger was not conceived in any genuine purpose which mergers are designed to serve*. Its object and aim was to reclassify the defendant's shares in a manner which the Supreme Court of this State has declared to be not permissible. * * *. The difference between using a wholly owned subsidiary already existing and using one specially created for the purpose, to accomplish by a merger an end which bears no perceptible relation to the problem involved in and incidental to the merging operation, is a difference which rests on no basis of substance." (Emphasis added.)

In reversing and rejecting this line of reasoning, the Supreme Court stated as follows at 11 A.2d 342:

"To say that the right to such dividends may not be destroyed by charter amendment under Section 26 of the General Law which, when the corporation was formed and the stock issued, did not authorize the destruction of the right, and with no alternative right in the shareholder to demand payment in money of the value of his stock, is not to say that the right may not be compounded under the *merger provisions of the law which warn the shareholder that his right is defeasible, and which, if he is dissatisfied, entitle him to demand and receive the money* value of his shares." (Emphasis added.)

■ In addition to the rejection of the Chancellor's examination as to purpose in *Havender,* subsequent decisions have further established that as a general principle Delaware courts will not inquire into the reasons motivating a merger or the business justification for it as a part of determining its validity. In *MacCrone v. American Capital Corporation,* D.Del., 51 F.Supp. 462 (1943) it was held that the reasons for the merger sought to be enjoined were not matters for judicial determination and that "the merger is an act of independent legal significance, and the mere fact that those who initiate it will receive some benefit does not make it fraudulent." 51 F.Supp. 469. And in *Bruce v. E. L. Bruce Company,* 40 Del.Ch. 80, 174 A.2d 29, 30 (1961) then Vice Chancellor Marvel summarized as follows:

". . . absent fraud or a showing that the terms of a proposed merger are so unfair as to shock the conscience of the court it is the policy of the courts of Delaware to permit contracting corporations to take advantage of statutory devices for corporate consolidation furnished by legislative act, *MacFarlane v. North American Cement Corporation,* 16 Del.Ch. 172, 157 A. 396; *Cole v. National Cash Credit Ass'n,* 18 Del.Ch. 47, 156 A. 183 and *Hottenstein v. York Ice Machinery Corp.,* D.C.Del., 45 F.Supp. 436 affirmed 3 Cir., 136 F.2d 944. Judicial interference is inappropriate in most instances of merger because an efficient and fair method has been provided which permits judicially protected withdrawal by stockholders from a proposed consolidation. *Finally, the reasons for a merger or the business necessity behind it are not matters for judicial determination [citing MacCrone, supra.]*" (Emphasis added.)

See also Folk, *The Delaware General Corporation Law* (1972) p. 332 where the author notes that the 1967 revision of the Delaware corporation statutes "in particular, reflects the continuing legislative approval of mergers and the avoidance of their disruption by protesting stockholders."

Of related significance, 8 Del.C. § 253 provides a simple procedure for the merger of a parent and its 90%-or-more owned subsidiary. In such a situation the merger can be accomplished under certain conditions by the unilateral act of the parent without the formal necessity of a vote. In recognizing and approving one of the obvious goals of this statute, our Supreme Court stated in *Stauffer v. Standard Brands, Incorporated,* Del.Supr., 41 Del.Ch. 7, 187 A.2d 78, 80 (1962) that "the very purpose of [ § 253] is to provide the parent corporation with a means of eliminating the minority shareholder's interest in the enterprise." And finally, in *David J. Green & Co. v. Schenley Industries, Inc.,* Del.Ch., 281 A.2d 30 (1971) a decision which, as here, involved a § 251 merger and wherein the parent corporation holding 84% of the subsidiary's stock sought to eliminate the minority interest by means of a three-party merger in which the minority stock of the subsidiary would be converted into cash and debt of the parent, it was indicated that the rights of minority shareholders under a § 251 merger are no greater than those under a § 253 merger. At 281 A.2d 35 then Vice Chancellor Marvel stated that:

" . . . under the law of merger each minority stockholder of Schenley has had at least constructive notice that he may be lawfully eliminated as such a stockholder unless the plan of corporate reorganization designed to absorb his stock interest is so grossly unfair as to be invalid. In short, I am of the opinion that the rights of the plaintiffs and of other minority stockholders of Schenley, viewed in the light of Glen Alden's holding of approximately 84% of the common stock of Schenley, are no greater under the present Delaware merger statute here involved (8 Del.C. § 251) than under the so-called short-merger statute

(8 Del.C. § 253). Thus, if plaintiffs and others are not satisfied with the value placed on their shares by Glen Alden, and no fraud or blatant overreaching is demonstrated, their recourse is to an appraisal . . . ."

Thus, it would appear that the status of our law, at least through *David J. Greene & Co. v. Schenley Industries, Inc.*, was such that (1) unless a minority shareholder could show fraud or blatant overreaching on the part of the majority in eliminating his stock interest through merger, the merger itself, and the reasons for it, were not subject to attack, and (2) a merger designed primarily to eliminate minority shareholders was not an improper use of either § 251 or § 253.

Plaintiffs seek to undercut this situation by coupling two recent unreported decisions of this Court with a series of recent case decisions which have stemmed from the current turmoil concerning the efforts of those with controlling stockholder interests in public corporations to "go private." Specifically, plaintiffs rely on several federal court decisions which have held in this context that a merger accomplished through the device of a "shell" corporation which eliminates public minority shareholders without the benefit of any other corporate business purpose constitutes prima facie a violation of Rule 10b–5 of the rules of the Securities and Exchange Commission. *Green v. Santa Fe Industries, Inc.*, 2nd Cir., 533 F.2d 1283, reh. den., 533 F.2d 1309 (1976); *Marshel v. AFW Corp.*, 2nd Cir., 533 F.2d 1277 (1976); *Box v. Northrop*, S.D.N.Y., 423 F.Supp. 4 (1976); *Albright v. Bergendahl*, D.Utah, 391 F. Supp. 754 (1974); *Bryan v. Brock and Blevins Co., Inc.*, 5th Cir., 490 F.2d 563 (1974). They also cite two state court decisions which seem to condemn a merger when its sole purpose is to eliminate a public minority. *Berkowitz v. Power/Mate Corporation*, 135 N.J.Super. 36, 342 A.2d 566 (1975); *Jutkowitz v. Bourns*, Cal. Super., C.A. 000268 (November 19, 1975).

The two unreported decisions of this Court are *Pennsylvania Mutual Fund, Inc., v. Todhunter International, Inc.*, C.A. 4845 (August 5, 1975) and *Tanzer v. International General Industries, Inc.*, C.A. 4945 (December 23, 1975). In *Tanzer* the plaintiffs sought a preliminary injunction to prevent the effectuation of a merger of a 100% owned subsidiary of the parent (IGI) into an 81% owned subsidiary (Kliklok) of the parent. The merger had been approved by a majority of the minority shareholders of Kliklok who were to receive a cash payment of $11 per share. Chancellor Quillen denied the preliminary injunction and allowed the merger to go forward since he was convinced that the merger was necessary to facilitate the future long-term debt financing of the parent, IGI. In passing, however, the Chancellor saw fit to make the following observation:

"The question presented is whether the merger should be enjoined because the purpose is to serve the interest of the parent. *It should be noted in this regard that IGI has a legitimate and present and compelling business reason to be the sole owner of Kliklok. IGI is not freezing out of the minority just for the purpose of freezing out the minority.*" (Emphasis added.)

In *Todhunter* the plaintiffs sought a temporary restraining order against the effectuation of the merger on the basis that the merger's only purpose was an unlawful freeze-out of the plaintiff's interests. In granting the relief Vice Chancellor (now Chancellor) Marvel stated as follows:

"First of all, it is established law in Delaware and elsewhere that an injunctive order must be earned and will not issue merely because it will possibly do no harm. Here, however, I have some doubt as to whether or not the merger under attack has a valid business purpose. In other words, this is probably or possibly not a case in which a dissenting stockholder is merely entitled to an

appraisal because of his unwillingness to continue in a changed business. Here there is to be no change in the business but merely an elimination of unwarranted minority stockholders.

"I feel therefore that there is some possibility on further argument and development of the case of a showing of illegality of this plan by reason of it being a possible manipulation of corporate control for private purposes with no proper business purpose in mind. I have doubt also as to whether or not a merger such as this may be accomplished under § 251 with the facility available under § 253. In the Schenley case, the Court was involved with two operating companies and not with two shell companies. A use of control to freeze out or manipulate a corporation to the detriment of the minority stockholders has always been frowned on by this Court. *Bennett v. Breuil Petroleum Corporation*, 34 Del. Ch. 6, 99 A.2d 236, *Condec v. Lunkenheimer*, 43 Del.Ch. 353, 230 A.2d 769, and *Schnell v. Chris-Craft*, 285 A.2d 437 (Sup.Ct.Del.)."

This language is indeed favorable to plaintiffs' position here. However, three things mitigate against relying upon it as authority to overturn generally the previous rulings of this Court which hold that inquiry into the purpose of a merger is not a proper judicial function. First, the matter arose upon the eve of a stockholders meeting and the exigencies of the situation of necessity prevented an in-depth examination of the problem by the Court and counsel alike. I think the Chancellor's language fairly indicates that there were other matters to consider. This never occurred because the case was apparently resolved by the parties without further participation by the Court. No doubt this had something to do with the fact that the decision was not reported.

Secondly, as noted earlier, in none of the three authorities cited by the Chancellor was a merger situation involved. Third, to the extent *Todhunter* might indicate that an independent business purpose is necessary to validate a merger, it would run contrary to, or at least modify, the decisions in both *Bruce v. E. L. Bruce Company* and *David J. Greene & Co. v. Schenley Industries, Inc., supra.* Both of these decisions were rendered by Chancellor Marvel and if they are to be altered by a later opinion of the same author it should be because he says so and not because I find such an intention from an unreported letter opinion in which he sees fit not to mention either of them.

As to the *Tanzer* decision, the language pertaining to "freezing out the minority" is clearly offered for clarification purposes and at best is dictum. Moreover, the decision, at least back-handedly, recognizes that the lack of a business purpose for the subsidiary being merged does not of itself state a claim for relief against the merger. It is to be remembered that the injunction was denied in *Tanzer* because the parent majority stockholder had a valid purpose to be served by the merger. In the present case, the allegation is that the merger served no corporate purpose of Magnavox; there is no similar charge as to North American.

For these reasons I conclude that neither *Tanzer* nor *Todhunter* dictate any departure from our existing precedents to the extent of requiring a proper and independent business purpose for the merger of a corporation in order to justify the elimination of its minority shareholders. Thus, I am left with plaintiffs' authorities from other jurisdictions.

■ While the federal cases make for interesting reading (particularly the dissent of Judge Moore in *Green v. Santa Fe Industries, Inc., supra*), they are readily distinguishable from plaintiffs' cause of action here because they all involved alleged violations of S.E.C. Rule 10b–5, and as such they stand only for the proposition that allegations which charge that the sole purpose of a merger is to eliminate public

minority stockholders state a claim under Rule 10b–5. While it is clearly within the purview of the federal courts to so construe a federal statute for federal purposes, it provides no basis for this Court to nullify a Delaware statute or to ignore the explicit rulings of the Delaware Supreme Court. For instance, the fact that a shareholder intends to use a stock list for an improper purpose under federal law has been held no basis to deny him his statutory right to obtain the list under Delaware law. Compare *General Time Corporation v. Talley Industries, Inc.,* Del.Supr., 240 A.2d 755 (1968); *Kerkorian v. Western Airlines Inc.,* Del.Ch., 253 A.2d 221, aff'd Del.Supr., 254 A.2d 240 (1969). See also *Investment Associates v. Standard Power & Light Corp.,* 20 Del.Ch. 225, 48 A.2d 501, aff'd Del.Supr., 29 Del.Ch. 593, 51 A.2d 572 (1947) wherein it was held that alleged violations of federal proxy laws could not determine the validity of proxies under Delaware law.

Needless to say, neither of the state cases, *Berkowitz v. Power/Mate Corporation* nor *Jutkowitz v. Bourns, supra,* are controlling on this Court. The factual basis on which they justified relief, however, is of interest. The same can be said of *Marshel v. AFW Corp., supra.* In each of these cases it was charged that a private corporation had gone public, sold stock and received needed capital thereby. The original stockholders retained controlling interests. Later, after some degree of prosperity, but at a time when depressed market conditions caused the stock to be worth considerably less than the price for which it originally sold, the majority, through the formation of a shell corporation, caused or attempted to cause the corporation to be merged with the majority's wholly-owned "shell," with the minority shareholders being thereby paid off and eliminated for a cash price substantially less than the cost of their initial investment. Compare also *Bryan v. Brock and Blevins Co., Inc., supra.*

Admittedly there seems something fundamentally inequitable about such a stark progression of events and perhaps a use of the Delaware statutes should not be permitted which would allow those with controlling interests who originally sought public participation to later kick out public investors for the sole reason that they have outlived their utility to those in control and are made easy pickings by existing market conditions. However, if such an exception is to be made it must wait for another day because, according to the complaint, such a situation does not exist here.

In this case, the allegations of the complaint acknowledge that Magnavox was a largely held public corporation and that North American, also a sizable enterprise, set out to acquire it. It did so by means of a public tender offer wherein it announced its intention to acquire all Magnavox stock —if not through tender, then by other means, including merger. As a result of the response to the tender offer, it ended up with 84.1% of the Magnavox stock and did so by paying a price considerably in excess of that for which the stock was then being traded. Having arrived at that juncture it proceeded to use its dominant stockholding position to bring about a merger so as to eliminate the remaining minority and thus fulfill its announced intention to acquire all Magnavox stock. Under the present status of our law as set forth previously, I cannot find any basis to require North American to adjust midstream and first show an independent purpose which would benefit Magnavox in order to complete its announced take-over intentions by means of a merger pursuant to 8 Del.C. § 251.

I therefore conclude that to the extent that the complaint charges the merger to be fraudulent in that it served no business purpose of Magnavox, it fails to state a claim upon which relief can be granted.

II. *The Allegation That The Merger Violated The Provisions Of The Delaware Securities Act.*

The complaint alleges that in connection with the merger transaction the defendants engaged in acts of fraud and de-

ceit in violation of 6 Del.C. § 7303 by causing false and misleading statements of material facts to be made to the minority shareholders and by omitting and failing to disclose material facts necessary, in light of the circumstances, to prevent such statements from being misleading, all with the intention to induce the minority shareholders to approve the merger and exchange their Magnavox stock for $9.00 in cash. Specifically, it is charged that the defendants, by and through the use of the proxy statement sent to minority shareholders in connection with the merger

"(a) Represented that the directors of Magnavox believed that the proposed merger was in the best interest of Magnavox and its minority stockholders, whereas, in fact, the directors of Magnavox knew or should have known that the merger was grossly detrimental to Magnavox and its minority stockholders.

"(b) Did not disclose or even mention that Magnavox's directors initially had urged Magnavox's stockholders to reject Development's tender offer.

"(c) Failed to disclose the reasons advanced by Magnavox's management in opposition to Development's tender offer, including the fact that Magnavox's book value was substantially in excess of the per share price offered in the original and modified tender offers.

"(d) Failed to disclose that Magnavox's management agreed to withdraw their opposition to Development's tender offer and to cooperate with Development in acquiring control of Magnavox only after Development agreed to permit 16 officers of Magnavox including defendants DiScipio, Minahan, and Schrey to retain their jobs with Magnavox for a period of at least two years at their then salaries.

"(e) Omitted to disclose material facts about the value which Development and North American had attached to Magnavox's stock in making their decision to propose the merger.

"(f) Concealed the fact that the merger served no valid corporate purpose or compelling business need of Magnavox and was detrimental to the interest of the public minority stockholders of Magnavox.

"(g) Concealed the true reason for the merger: namely, that, at the time of the proposed merger, the depressed market price per share of Magnavox was being used as a pretext for a merger which would enable the defendants to obtain sole ownership of the business and assets of Magnavox at a per share merger price determined by defendants which was grossly unfair and inadequate.

"(h) Failed to disclose the disproportionate amount of gains which Development and North American anticipated they would receive, at the expense of Magnavox's minority stockholders, through consummation of the merger.

"(i) Omitted to disclose that, because of the relationship among Magnavox, Development and North American, defendants would bear the burden of establishing the entire fairness of the proposed merger.

"(j) Concealed from the minority stockholders of Magnavox the unfairness and illegality of the proposed merger and strongly implied that the public minority stockholders had no practical alternative to the terms proposed to them.

"(k) Implied that appraisal proceedings pursuant to 8 Del.C. § 262 would be the sole remedy available to Magnavox's minority stockholders who objected to the terms of the merger and failed to indicate or disclose the other legal and equitable remedies which would also be available to such stockholders, including the right to seek equitable relief and damages arising out of any fraud or illegality including but not limited to the

gross unfairness of the price per share being offered."

6 Del.C. § 7303 is almost identical to, and in fact is identical in the wording of its three subprovisions to, Securities And Exchange Commission Rule 10b–5. It reads as follows:

"It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

"(1) To employ any device, scheme, or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

Defendants, conceding for the purpose of the motion that the aforesaid allegations of the complaint charge something of substance and that they are true, take the position that the proxy statement could not have defrauded the minority · and thus brought about approval for the merger thereby. Their reasoning is simple. Because Development owned 84.1% of the Magnavox stock at the time, the merger was going to be approved anyway, as the proxy statement indicated. Thus, assuming that there was a misstatement or material omission in it, the proxy statement could not have been the cause of the sale and purchase of plaintiffs' stock pursuant to the terms of the merger.

In addition, defendants challenge the standing of plaintiffs to rely on the Delaware Securities Act. They argue that the Securities Act is a "Blue Sky" law which is part of the commercial law of this State intended to govern, and constitutionally limited to, securities transactions which have some meaningful nexus with Dela-

ware. As such, they say, it is not and was never intended to be part of the Delaware corporation law. They point out that the plaintiffs allege themselves to be residents of Pennsylvania and that it may therefore be assumed that they received all proxy material in Pennsylvania. It is not alleged that the proxy material originated within Delaware. Moreover, proxies were returned to New York and, after the merger was effected, share certificates were to be submitted to and payment checks were to be mailed from New York. Thus, defendants argue, it is clear from the complaint and the proxy statement made a part thereof, that no part of the transaction whereby plaintiffs "sold" their stock pursuant to the merger terms took place in Delaware.

Plaintiffs respond to this latter argument by pointing out that the shareholders meeting to approve the merger was held in Delaware, the proxies were brought to Delaware for the meeting, and that consequently the merger-directed "sale" was actually consummated in Delaware when the vote was taken and the required documents filed with the appropriate Delaware governmental agencies. However, I deem it unnecessary to wrestle with this particular problem because I am persuaded that defendants' first argument has merit.

It is to be noted that the above provisions of § 7303 merely make certain acts and practices unlawful. It says nothing of the right to relief flowing therefrom. Rather the legal consequences are set forth at § 7322, which prescribes criminal penalties, and at § 7323, which establishes civil liabilities. § 7323(a)(2) states that any person who

"(2) Offers, sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading (the buyer or seller not knowing the untruth or omission) . . . is liable to the person

buying or selling the security from or to him . . .." (Emphasis added.)

 This section must necessarily relate to § 7303 since it tracks its very language relating to false statements and omission of material facts. The thing it adds to § 7303, however, is the words "by means of." Thus, I am of the opinion that the two statutes must be read together when § 7303 is relied upon to state a cause of action, and consequently, to be actionable, the sale or purchase must have been caused by the false representation or the material omission in the statements offered to induce the sale or purchase.

The complaint here charges that defendants induced plaintiffs to exchange their stock pursuant to the terms of the merger by means of (or "by and through the use of" to use the precise language) the allegedly deficient proxy statement. However, the obvious fact is that whether or not minority shareholders were induced by the proxy statement to vote for the merger, it was going to be approved regardless because the defendants had all the votes they needed by virtue of their controlling stock interest. Thus, it was the act of the majority shareholder that caused the plaintiffs to exchange their stock for $9.00 a share or else seek an appraisal, and not any action of the minority shareholders induced "by means of" the proxy materials. For a similar result under federal regulations, see *Barnett v. Anaconda Co.*, S.D.N.Y., 238 F. Supp. 766 (1965).

Plaintiffs argue that *Barnett v. Anaconda Co.* does does not necessarily reflect the federal law within its circuit, and they point to other federal court interpretations under Rule 10b–5· which hold that with regard to material omissions actual reliance on the misleading statement by a stockholder is not necessary in order to make out a cause of action. See *Schlick v. Penn-Dixie Cement Corporation,* 2nd Cir., 507 F.2d 374 (1974); *Laurenzano v. Einbender,* E.D.N.Y., 264 F.Supp. 356 (1966), aff'd, 2nd Cir., 448 F.2d 1 (1971). Com-

pare also, *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). This may be true with regard to some interpretations given to the S.E.C. rule. However, the action here is being brought under a recently enacted State statute, and as such I feel compelled to give it the interpretation which seems clearly required by its terms.

Accordingly, assuming without deciding that 6 Del.C. Ch. 73 is available to plaintiffs, I conclude that the complaint fails to state a cause of action under the Delaware Securities Act as alleged.

III. *The Allegation Of Fraud Based On A Breach Of Fiduciary Duty*

 Stripped of its two main thrusts, the balance of the complaint, fairly viewed, rests on the alleged violation of the fiduciary duty of the defendants in failing to be candid with minority shareholders as to the events upon which the $9.00 per share value of the Magnavox stock was determined. In essence, through a multitude of allegations which in the main appear to be generalizations, the complaint charges that by virtue of the so-called conspiracy which resulted in the Magnavox board withdrawing its objection to the 1974 tender offer upon Development's increase of its offer from $8.00 to $9.00 per share, and in thereafter agreeing to the merger on the basis of payment of the same price per share for minority stock, without disclosing to minority shareholders in the proxy statement that such a price was grossly inadequate based on the circumstances then existing, the defendants caused the minority shareholders to be forcibly removed from equity participation in Magnavox and further forced them to accept for their stock an amount per share which defendants knew or should have known was well below the intrinsic value of the shares. It seems to me that despite the various ways in which plaintiffs attempt to allege fraud and self-dealing by defendants, these remaining allegations inevitably reduce themselves to one thing,

namely, that at $9.00 per share they were not paid the true value of their stock pursuant to the terms of the merger which the defendants collectively engineered. Thus, they seek to set aside the merger as being fraudulent because the cash price per share to be paid to minority shareholders was inadequate.

When this is the basis for objection to a corporate merger, it is established law that the remedy of the dissatisfied shareholders is to seek an appraisal of the value of their shares pursuant to the procedures set forth under the appraisal statute, 8 Del.C. § 262. *Stauffer v. Standard Brands, Incorporated, supra; Leob v. Schenley Industries, Inc.,* Del.Ch., 285 A.2d 829 (1971); *David J. Greene & Co. v. Schenley Industries, Inc., supra.* In fact, since the matter is also assigned to me, I think it appropriate to take notice that such an appraisal proceeding has already been commenced in this Court concerning the same merger which plaintiffs seek to undo here.

Plaintiffs argue that appraisal is not a realistic remedy in view of the attendant expense and delay plus the informational advantage that management has over outsiders who seek to challenge the corporate books. They liken it to a struggle between the Christians and the lions, characterizing it as a battle fought on a Roman field under Roman rules with a predictable result involving no immediate risk of loss to the Romans. This may well represent the viewpoint of some. However, if a better method is to be found, it must be championed through the General Assembly and not through a complaint which asks this Court, in effect, to ignore the appraisal statute and the decisions of our Supreme Court which have held it to provide an adequate remedy.

Thus, for the reasons stated, I conclude that the remaining allegations of the complaint, which purport to charge a reach of fiduciary duty by defendants for reasons apart from the allegations concerning a lack of a corporate purpose benefiting Magnavox and violation of the Delaware Securities Act, also fail to set forth a claim upon which relief may be granted.

In view of the foregoing determinations it becomes unnecessary to consider the alternative applications of the defendants to deny the claimed class action status of the suit, to strike certain portions of the complaint, and to stay further proceedings pending a determination of the co-existing appraisal action.

The motion to dismiss the complaint for failure to state a claim is granted. Order on notice.