135 N.J. Super. 36 (1975)
342 A.2d 566
HERMAN BERKOWITZ, PLAINTIFF,
v.
POWER/MATE CORPORATION, A NEW JERSEY CORPORATION, GENERAL AMERICAN INDUSTRIES, INC., A NEW JERSEY CORPORATION, RICHARD GRAHAM, MARION GRAHAM, AND MARVIN CHARTER, DEFENDANTS. ROBERT GREENBERG, PLAINTIFF,
v.
POWER/MATE CORPORATION, A NEW JERSEY CORPORATION, GENERAL AMERICAN INDUSTRIES, INC., A NEW JERSEY CORPORATION, RICHARD GRAHAM, MARION GRAHAM, AND MARVIN CHARTER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 8, 1975.
*38 Mr. Donald Coburn for plaintiffs (Messrs. Jacobs & Coburn, Esqs.) and Mr. Robert Greenberg (Messrs. Greenberg & Feiner, attorneys),
Messrs. Boardman & Epstein for defendants (Messrs. Bachner, Tally & Mantell, of the New York bar, of counsel.)
*39 GELMAN, J.S.C.
These are consolidated class actions brought by public stockholders of defendant Power/Mate Corporation (Power/Mate) to enjoin a proposed merger of Power/Mate into defendant General American Industries, Inc. (General). The actions were instituted by orders to show cause and, on notice to and in the presence of counsel for all parties, the court restrained the consummation of the merger pending further hearing. The matter is before the court at this time on plaintiffs' application for a preliminary injunction against the proposed merger.
The undisputed facts are as follows: Prior to December 1968 Power/Mate was a privately held New Jersey corporation engaged in the business of manufacturing and marketing electronic modular and laboratory power supply equipment. It had been organized in 1966 to succeed to a business founded by defendant Richard Graham in 1965. During December 1968 Power/Mate issued and sold to public investors 110,000 shares of its stock at a price of $5 a share. The public offering was made pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act of 1933. At the time of the public offering the "inside," or majority stockholders, retained ownership of 225,000 shares, or about 69%, of Power/Mate's stock.
After the public offering and for a period of about 1 1/2 years, Power/Mate's publicly held stock was traded in the over-the-counter market. During December 1968 the price of the stock ranged between a low bid of $9 a share and a high asked price of $21. During 1969 and the first half of 1970 the range was between $2.25 and $18. The stock was listed for trading on the National Stock Exchange in the second half of 1970 and continued to be so listed until that Exchange terminated operations on January 31, 1975. During the period of its listing the high and low prices ranged from $4.50 a share (Second quarter of 1971) to a low of $.50 a share (fourth quarter of 1974). Since February 1, 1975 the stock has been traded in the over-the-counter market at a high asked price of $2.50 and a low bid of $.75.
*40 Since the public sale of its stock Power/Mate has continued to carry on its business activities on a profitable basis. The per share earnings record for the years 1970-1974 has been as follows: 1970  $.41, 1971  $.04, 1972  $.14, 1973  $.33, and 1974  $.45. Between 1970 and 1974 Power/Mate's sales increased from $1,857,812 to $5,169,272, and the book value of its stock increased from $2.60 a share to $4.10 as at December 31, 1974. Power/Mate has never declared or paid a dividend on its stock at any time.
For the six-month period ending December 31, 1974 the earnings were $.41 a share, as compared to $.12 for the equivalent 1973 period. On December 30, 1974, it should be noted, the individual defendants, Richard Graham and Marvin Charter  who are the principal officers, directors and controlling stockholders of Power/Mate  declared a bonus of $100,000 each to themselves. But for the bonus, the earnings for the six months ending December 31, 1974 would have been approximately $1.04 a share. Prior to the declaration of the bonus Graham and Charter were being paid salaries at the rate of $60,000 and $55,000, respectively.
Power/Mate's sales for the six-month period ending December 31, 1974 increased to $3,253,195 from $2,331,544 for the 1973 period. January 1975 sales were 65% over those for January 1974, and February 1975 sales showed a decrease of 6.5% from February 1974. As of March 3, 1975 orders on hand totalled $2,300,000 as compared to $1,250,000 on March 3, 1974. At December 31, 1974 Power/Mate's current assets were $2,271,854 as compared to current liabilities of $1,257,408. Its noncurrent assets totalled $352,581 as against noncurrent liabilities of $74,029.
General was organized as a New Jersey corporation on March 27, 1975, by defendants Graham and Charter, who own all of General's capital stock. Graham and Charter contributed all of their Power/Mate stock, consisting of 225,250 shares, to General, and the Power/Mate Stock is General's sole asset. General carries on no business activity of its own.
*41 On March 31, 1975 the boards of directors of Power/Mate and General  both boards consisting of the same persons, i.e., Richard Graham, his wife Marion Graham and Marvin Charter  entered into a merger agreement. The basic terms of the merger agreement provide for the merger of Power/Mate into General, and the payment of each Power/Mate shareholder at the rate of $2 a share (except for the Power/Mate shares held by General, which will be cancelled). Upon completion of the merger the name of General will be changed to Power/Mate and the new Power/Mate will have succeeded to all of the assets and liabilities and the business of the old Power/Mate. As stated in the proxy statement, the sole objective of the merger "is to eliminate the publicly-held interest" in Power/Mate.
There are presently 89,850 shares of Power/Mate in the hands of the public, representing 28.5% of the issued and outstanding Power/Mate stock.[1] General intends to borrow from a bank the $179,700 required to pay the public stockholders, and to repay the bank loan immediately after the merger from the cash assets of Power/Mate it will receive as a result of the merger.
On April 3, 1975 Power/Mate's board of directors sent notice to its stockholders of a special meeting of stockholders to be held on April 30, 1975 to consider and vote on the proposed merger of Power/Mate into General. The notice was accompanied by a proxy statement containing essentially the facts set forth above. In addition, the proxy statement notes that General, as the owner of 71.5% of Power/Mate stock, intends to vote its stock in favor of the merger; that a two-thirds majority[2] is required for approval, and that pursuant *42 to N.J.S.A. 14A:11-(1)(a) the stockholders of Power/Mate will have no right to dissent but will be bound by the terms of the merger.
After advising the stockholders that the officers and directors of Power/Mate and General are identical, the proxy statement goes on to say that "[i]t might be considered that these directors had a conflict of interest in making the decision and that the exchange price * * * might not have been the same had there been no common directors * * *." Later on in the statement it is said that the price to be paid to Power/Mate's public stockholders and the terms of the proposed merger is, in the opinion of Power/Mate's board of directors, "fair and equitable to the public stockholders." It is also noted, however, that the Grahams and Charter "believe that the merger will enable them to acquire full ownership of Power/Mate's business at a price which is advantageous to them."
According to the proxy statement, the public stockholders will derive a benefit from the merger for two reasons: (1) the price being paid is above the bid price of $1.25 a share on March 27, 1975 (the asked price on that date was $2), and (2) the publicly held stock has no liquidity since there is but a limited market demand for the stock. The statement further notes that in December 1974 Power/Mate purchased 20,000 shares of its stock from a "non-affiliated stockholder in an arms-length" transaction at $2 a share. Finally, it is said that the price of $2 a share being paid to the public stockholders is "based primarily on the analytical report prepared for Power/Mate's Board of Directors by M.J. Papier Co., Inc.," who is said to be an independent financial consultant retained for this purpose. A copy of the Papier report is annexed to the proxy statement. Papier was paid $10,000 by Power/Mate for this report.
The special meeting of stockholders was held on April 30, 1975. General voted its stock in favor of the merger. Of the 89,850 shares of publicly held stock, 20,140 votes (22.4%) were cast in favor of the merger and 11,750 votes (13.1%) *43 were cast against. Only 35.5% of the publicly held stock voted at the meeting.
The facts before the court present a classic example of the now popular concept of "going private" which, in the vernacular of the financial community, has become the "newest game in town." Numerous privately-held companies which were taken "public" by their insiders during the boom market for new issues that prevailed during the late 1960's are now, as a result of the current stock market depression, seeking  through the same insiders  to buy back the public's interest at a fraction of the price paid by the public for its stock. This phenomenon has been commented upon in the law reviews. See Note, "Going Private", 84 Yale L.J. 903 (1975); Borden, "Going Private-Old Tort, New Tort or No Tort", 49 N.Y.U.L. Rev. 987 (1974); cf. Brudney and Chirelstein, "Fair Shares in Corporate Mergers and Takeovers," 88 Harv. L. Rev. 297 (1974); Vorenberg, "Exclusiveness of the Dissenting Stockholder's Appraisal Right," 77 Harv. L. Rev. 1189, 1192-1193. In a recent speech Commissioner A.A. Sommer, Jr. of the SEC offered the following comment on the subject of "going private":
What is happening is, in my estimation, serious, unfair, and sometimes disgraceful, a perversion of the whole process of public financing, and a course that inevitably is going to make the individual shareholder even more hostile to American corporate mores and the securities markets than he already is. [Sommer, "Going Private": A Lesson in Corporate Responsibility, BNA Sec. Reg. & L. Rep. No. 278 (Nov. 20, 1974)]
The resulting freeze-out of minority stockholders has been likened by one author to "a sort of private eminent domain proceeding." Vorenberg, op. cit. at 1191. Through the precise observance of statutory merger provisions the inside controlling stockholders can compel the minority to sell their stock to them at a price fixed by the insiders and paid for, as here, out of corporate assets.
The New Jersey Business Corporation Act sets forth the procedure for and authorizes a merger between domestic *44 corporations. N.J.S.A. 14A:10-1 et seq. The act requires only approval by the boards of the directors of a plan of merger, N.J.S.A. 14A:10-2, and the vote of two-thirds of the stockholders in favor of the plan.[3]N.J.S.A. 14A:10-3. The merger becomes effective upon filing a certificate of merger with the Secretary of State. N.J.S.A. 14A:10-4. Where, as here, the stockholders of the corporation which is a party to the merger are to be paid in cash, the stockholder does not have the right to dissent to the terms of the merger. N.J.S.A. 14A:11-1(1) (a). Hence, the proposed merger of Power/Mate is in full technical compliance with the requirements of the act, and the public stockholders have no statutory rights to prevent the merger from taking place.
Furthermore, there are no rules or regulations of the Securities and Exchange Commission presently in force which would be violated by the proposed merger; its rules and regulations call only for full disclosure in the proxy statement issued to stockholders, and for present purposes, we may assume that such disclosure has been made. It may be noted, however, that the SEC has given notice of a public fact-finding investigation and rule-making proceeding in the matter of "going private" transactions by public companies. SEC, Securities Act of 1933, Release No. 5567/February 6, 1975, published in BNA, Sec. Reg. L. Rep. No. 289 (Feb. 12, 1975). Proposed Rule 13e-3B would prohibit the merger proposed here, since the merger has no valid business purpose.[4]
*45 However, neither the parameters of the Business Corporation Act nor the regulations of the SEC dispose of the matter at issue here. Those who control the affairs and conduct of a corporation, whether public or private, have a fiduciary duty to all the stockholders and the powers they have by virtue of their majority status are powers held by them in trust. See Lebold v. Inland Steel Co., 125 F.2d 369, 372-3 (7 Cir.1942). They cannot use their powers for their own personal advantage and to the detriment of the minority stockholders. And as fiduciaries they cannot do indirectly through a corporation that which they cannot do directly. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).
In Outwater v. Public Serv. Corp. of N.J., 103 N.J. Eq. 461 (Ch. 1928), aff'd 104 N.J. Eq. 490 (E. & A. 1929), Vice-Chancellor Backes was presented with a substantially similar set of facts arising out of the merger of several public utility companies into the Public Service Electric & Gas Company. There, Public Service Corporation owned all of the stock of Electric & Gas, which in turn owned more than two-thirds of the stock of the merging companies, and Public Service Corporation's board of directors controlled all of their boards of directors. The minority stockholders of the merging companies were to receive preferred stock (nonvoting) in exchange for their shares at prices fixed in the merger agreement. The court offered the following comments which are pertinent here:
The merger agreement, procedurally, is in legal form, and the right to merge is in entire harmony with the complainants' corporate contract, but as the merger is, in reality, an appropriation of corporate property by a majority of stockholders, by force of numbers and the grace of the statute, and while no valid legal objections can be interposed on that score (Colgate v. United States Leather Co., 73 N.J. Eq. 72), the agreement calls for careful judicial scrutiny, *46 and the burden is on the majority to show that the consideration is fair and equitable, and judgment, as to fairness, is not to be influenced by the heavy vote of approval, as it otherwise would be if the vote were independent, as indicated in Berger v. United States Steel Corp., 63 N.J. Eq. 809.

* * * * * * * *
The Public Service corporations contest the right of a court of equity to interfere in the internal affairs of the merging companies in the absence of fraud, actual or constructive. There is, of course, no suggestion that the majority stockholders entered into the merger agreement with actual intent to defraud the minority. Neither have they earned a decoration for unselfishness. * * * The complainants' companies are about to be absorbed and the minority stockholders face the possibility, if not the probability, of being cast into the discard. This, by right of might and by means unwarranted and oppressive, and their only appeal for relief is to this court. The merger will be enjoined. [103 N.J. Eq. at 464, 467-468]
More recently our Supreme Court had occasion to consider the issue anew in Brundage v. New Jersey Zinc Co., 48 N.J. 450 (1967), a case which also addressed itself to the rights of minority stockholders upon a merger. While the court there sustained the merger as being fair and equitable to the minority, it dealt with the question of equity's jurisdiction to intervene even though the merger complies with statutory law. Speaking for the court Justice Jacobs said:
The power reserved in our organic and statutory law was broadly phrased and broadly intended. It should liberally be viewed as part and parcel of the tripartite arrangements between the State, the corporation and the stockholders * * * and thus viewed, as permitting reasonable corporate charter amendments having legitimate business ends. Under this approach there can be no question with respect to the application here of the two-thirds vote provision of our present merger statute * * * bearing in mind not only the broad appraisal rights afforded to dissenters * * * but also the broad protection afforded to them under the settled and continuing New Jersey doctrine that a merger, even though it complies procedurally with the statutory requirements, must also satisfy basic equitable requirements of good faith and fair treatment. [at 470]
In Bryan v. Brock & Blevins Co., Inc., 490 F.2d 563 (5 Cir.1974), the controlling stockholders of a privately-held corporation sought unsuccessfully to purchase the stock interest *47 of a minority stockholder through a private sale. They then formed a new corporation to whom they transferred their stock and the boards of directors of each voted upon a plan of merger the effect of which would be to freeze out the minority stockholder, leaving him with the cash price fixed by the merger agreement for his stock or his appraisal rights under the Georgia corporation statute. The court noted (at 569) that there was little law on this subject as it pertained to mergers. However, it affirmed the judgment of the trial court setting aside the merger, stating:
The trial court here simply held that the dominant stockholder interests in this case utilized the Georgia Corporation Merger Statute to accomplish something that they could not accomplish directly. The finding was to the effect that a new corporation was set up, having no business purpose of its own and no pre-existing viability of any kind, solely for the purpose of effecting a "freeze-out," * * *
It was with this concept in mind, that the trial court found the absence of a "business purpose" for the proposed merger of Brock and Blevins into Power Erectors. In the absence of such business purpose Power Erectors was purely a sham party created to circumvent the rule of law that prohibits a majority of stockholders of a corporation, absent any charter provision as to the contrary, to force the minority interests to surrender their stock holdings. Implicit in this holding was a construction of the Georgia statute that comports with equity in good conscience. Such construction would read out of the statute a situation where there was no pre-existing corporation to be merged, but instead where such corporation was created solely for the purpose of accomplishing an illegal result. Such construction is clearly warranted by the language quoted above from Pepper:
"He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements." [at 570]
The court in Bryan thus set aside the merger based upon a finding that a merger which serves no business purpose other than the termination of the minority stockholder's interest is ipso facto a breach of the controlling stockholders' fiduciary duties to the minority. This view was followed in Albright v. Bergendahl, 391 F. Supp. 754 (D. Utah, 1974), and is advocated by some in the academic community. See *48 Vorenberg, op. cit. at 1204. It is not without its detractors, however. See Borden, op. cit. at 996, 1037-1038. There is language in our Supreme Court's decision in Brundage (quoted supra) which suggests that New Jersey may follow the "business purpose" test to prevent the destruction of minority stockholder rights in this factual setting, but the issue was not squarely presented nor passed upon by the court in that case. While the Bryan approach is tempting to follow, it is unnecessary at this time to rule that the lack of a valid business purpose is sufficient to prevent a merger which otherwise complies with our Business Corporation Act.
Enough has been shown by the pleadings, the undisputed facts and the testimony to raise serious questions as to the fairness of this "freeze-out" of the minority stockholders. By their own admission the controlling stockholders of Power/Mate intend to acquire the public's stock at a price advantageous to them. Some measure of their gain may be found in the fact that after payment of the purchase price to the minority stockholders, the insiders will have achieved a gain of $.66 a share in the book value of the stock they will hold in the new Power/Mate. This represents an absolute gain to them of $148,648 in the book value of their stock, after deducting merger expenses estimated at approximately $40,000.
Then again, the timing of the merger suggests that the insiders have chosen a most opportune time  in relation to Power/Mate's earnings record since it went public  to buy out the minority at an unreasonably low price. Coupled with this is the fact that the two principal officers of Power/Mate gave themselves bonuses of $100,000 each so as to significantly reduce the company's earnings only three months prior to the proposed merger. While we can only speculate at this juncture, it may be doubted whether the market price of Power/Mate stock would have remained at $1.25 bid and $2 asked had the company announced earnings for the six-month period ending December 31, 1974 in excess of $1 a share. Since the justification for the $2 a share being offered *49 to the minority is closely tied to the market price of the stock, the conduct of the insiders obviously may have adversely affected the market price. Closer scrutiny of this aspect of the transaction is clearly warranted.
As noted in Outwater, supra, and in countless other decisions of the courts of this state and elsewhere, corporate officers and directors who engage in self-dealing transactions have a heavy burden of showing that they have not violated their fiduciary obligations to the minority stockholders. At a minimum their conduct is subject to a searching inquiry to determine whether it conforms to accepted concepts of fairness and equity. It may well be that the public stockholders of Power/Mate would benefit from the purchase of their stock. If so, the question at issue is whether the price they are being offered for their interest in Power/Mate is a fair and reasonable one.
Defendants urge in effect that any price offered the minority in excess of the market price is per se fair and reasonable. This surely is an anomalous position inasmuch as the principal justification for the transaction is that there really is no market for the public stock, and hence the "market price" may only be an arbitrary if not an altogether fictitious concept in this setting. Nor does the report of the independent consultant add much weight to defendants' position. His conclusions as to the fairness of the price being offered to the Power/Mate stockholders is based largely upon a comparison with a series of cash offers in other "freeze-out" or "going private" transactions which presumably may suffer from the same basic infirmity as that involved here, i.e., the prices offered were determined not as the result of arms-length bargaining but by the corporate insiders. Such transactions are surely not a barometer by which one can or should measure the fairness of the price offered here.
Finally, defendants urge that injunctive relief is not an appropriate remedy. It is suggested that the minority stockholders can be adequately compensated by an award of money damages if it is ultimately determined that the terms *50 of this merger are unfair. This argument, of course, presumes that a "freeze-out" of the minority stockholders via the merger route is permissible under our law so long as the price paid is a fair one, and further presumes this court has the power to fix the price to be paid to the minority stockholders for their stock. Neither presumption is free from doubt, and until such doubts are resolved the consummation of the merger should be enjoined. See Brundage v. The New Jersey Zinc Co., supra, 48 N.J. at 461-463.
NOTES
[1] There are 95,300 shares of issued Power/Mate stock held as treasury stock.
[2] Elsewhere in the proxy statement it is said that only a majority of the stockholders need to approve the merger. In this respect the proxy statement is confusing, if not misleading.
[3] With respect to corporations organized after the effective date of the recent amendment to N.J.S.A. 14A:10-3, a simple majority vote will suffice. L. 1973, c. 366, § 53.
[4] It is suggested by defendants that this merger has a "valid" business purpose in going private, since the new corporation will save expenses "inherent in its status as a publicly held corporation." The expenses referred to include SEC fees, transfer agent fees and printing expenses. It may be noted, however, that Power/Mate's registration under § 12(b) of the Securities Exchange Act of 1934 has been terminated, and since it has but 267 stockholders it is not required to register under § 12(g) of that act, and it is not required to file its proxy materials with the SEC, nor will it be required to file any reports with the SEC under § 15(d) after July 1, 1975. In the judgment of the court, the saving of such expenses as claimed by defendants do not constitute a valid business purpose. See Note, "Going Private," 84 Yale L.J. 903, 907-8 (1975).