### FIREMAN'S FUND INSURANCE COMPANIES, Plaintiff,

v.

**MEENAN OIL COMPANY, Redi–Flo Corporation of New Jersey, Great American Surplus Lines Insurance Company, Liberty Mutual Insurance Company, Amerada Hess Corporation, Travelers Insurance Companies and Royal Insurance Companies of America, Defendants.**

No. 84–CV–3285.

United States District Court, E.D. New York.

Jan. 25, 1991.

Nicholas M. Cannella, Fitzpatrick, Cella, Harper & Scinto, New York City, for cross-plaintiff.

Michael Twomey, Olwine Connelly Chase O & W, New York City, for cross-defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

The instant motion for summary judgment by Liberty Mutual Insurance Company ("Liberty") and the cross-motion for partial summary judgment by Meenan Oil Company ("Meenan") and Redi–Flo Corporation ("Redi–Flo") arise out of a suit commenced by Fireman's Fund Insurance Companies ("FFIC") to quiet a coverage dispute

between the insured—Meenan—and its several insurers. All three of the moving parties—Liberty, Meenan, and Redi–Flo—were named as defendants in the original action which sought a judicial declaration of rights and obligations under the various insurance policies. In their answer, Meenan and Redi–Flo asserted cross-claims against both Liberty and the Amerada Hess Corporation ("Hess") as well as a counterclaim against FFIC. After extensive discovery, Liberty filed a motion for summary judgment with respect both to Meenan's and Redi–Flo's cross-claims and to all other claims and cross-claims asserted against it. Meenan and Redi–Flo, in response, cross-moved against Liberty for partial summary judgment.

The motions were subsequently referred to Magistrate Caden, who filed a Report and Recommendation on May 3, 1990. The Report and Recommendation concluded that Liberty's motion for summary judgment should be denied and that Meenan's and Redi–Flo's cross-motion for partial summary judgment should be granted. Both sides then filed written objections to the Magistrate's Report and Recommendation.

## FACTUAL BACKGROUND

At issue in this determination are, in particular, two comprehensive general liability policies (the "Liberty policies") issued by Liberty to Meenan for the policy periods April 1, 1981 to April 1, 1982 and April 1, 1982 to April 1, 1983. The claims brought under these policies seek indemnification for costs related to the cleanup of oil leaked from an underground oil storage and distribution system located at Holiday City in New Jersey. The oil storage and distribution system that produced the spill is owned and operated by Redi–Flo.

Redi–Flo is a small and, at best, marginally profitable enterprise whose principal asset is the storage and distribution system at Holiday City. A wholly-owned subsidiary of Hess, Redi–Flo was purchased by Meenan in January, 1982, less than a year before Redi–Flo was forced to undertake the first stages of the cleanup operation

here at issue. Although Meenan was chiefly interested in purchasing a larger and more profitable Hess-owned retail heating oil operation based in Poughkeepsie, New York, it reluctantly acquired Redi–Flo as part of a package that included the Poughkeepsie facility because of Hess's insistence on linking the sale of the two operations. Indeed, in its desire to unload Redi–Flo, Hess offered the package to Meenan for $150,000 less than the sum Meenan had proposed for the Poughkeepsie facility alone. Redi–Flo was added at the time of purchase as an insured under the first of the Liberty policies issued to Meenan.

The dispute here at issue was precipitated by two incidents, one in November of 1982 when oil was discovered bubbling out of the ground and into a local stream, and the second in late April of 1983 when oil began surfacing at several other sites. These spills, however, were by no means the first that had occurred at Holiday City. Between 1971 and 1981, Redi–Flo, then a Hess subsidiary, experienced at least four major spills, including a set of leaks in 1980 that persuaded the New Jersey Department of Environmental Protection ("NJDEP") to become involved in the recovery process. Moreover, the system suffered a great many minor leaks throughout its lifetime, most of them the result of corrosion.

Corrosion caused by electrolysis—that is, by the flow of electrical current from the metal piping into the surrounding soil accompanied by the loss of metal into the soil—was apparently also the cause of first of the two major leaks that preceded the cleanup and, most probably, the second. The source of the first of these leaks was ultimately identified as a corrosion hole the size of a pin located some 2000 feet from the stream where the oil flow was first detected. Mr. Arthur Moller, Redi–Flo's president, commented in a December, 1982 statement to an insurance investigator that "[g]enerally speaking, a hole of that diameter and unrestricted could leak as much as 120 gallons per day," adding that "[t]his hole was obviously restricted by the surrounding dirt." Although the source (or sources) of the 1983 spills has never been located, Mr. John W. Storb, an engineering

consultant hired by Meenan in response to the incidents, indicated that the leakage was in all likelihood the result of electrolysis.

In 1988, following almost five years of technical study and recovery operations, Redi–Flo entered into an administrative consent order ("ACO") with the NJDEP. The ACO required Redi–Flo to continue the cleanup program, to submit monthly progress reports and to undertake certain additional measures and obligations. These various cleanup expenditures represent the alleged "damages" costs for which Redi–Flo invokes coverage under the Liberty policies.

While Meenan contends that it has also suffered "damages" costs as an insured, Meenan does not dispute that only Redi–Flo has incurred any actual expenses with respect to the Holiday City cleanup and that if a trial were held today—more than five years after the case commenced—Meenan could not prove that it has paid damages as an insured under the Liberty policies. Because Meenan has not incurred any such compensable expenses, Meenan's cross-claim against Liberty is dismissed, and Liberty's motion for summary judgment is, to that extent, granted. Accordingly, the discussion that follows will focus solely upon the issues related to Redi–Flo's cross-claim against Liberty and not on those asserted by Meenan.[1]

## DISCUSSION

Liberty's motion for summary judgment turns on the meaning of two interrelated clauses in the Liberty policies. The first is the so-called "occurrence" clause which provides that Liberty "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this policy applies, caused by an occurrence." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The second clause is the so-called pollution exclusion which provides as follows:

This policy does not apply: (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The history of these two clauses and the extensive legal commentary generated by them are canvassed in *Broadwell Realty Services v. Fidelity & Casualty Co.*, 218 N.J.Super. 516, 528 A.2d 76 (N.J.Super.Ct. App.Div.1987), a case, like the present one, that involves the cleanup of hazardous substances that leaked from underground tanks and migrated to adjacent lands and into a nearby stream. Relying upon its historical analysis, the Appellate Division held that the "occurrence" clause and the pollution exclusion are, in effect, two sides of the same coin. The "occurrence" clause provides coverage for damages resulting from pollution that is "neither expected nor intended from the standpoint of the insured," and the pollution exclusion permits coverage for damages resulting from pollution that is accidental—i.e., "neither expected nor intended." *Broadwell* cites the following explanation by the Insurance Rating Board for this apparent duplication within the policy.

Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of

---

**1.** Magistrate Caden took notice of Liberty's contention that "only Redi–Flo is liable, under the consent order, for the cleanup costs," but he held nevertheless that "[s]ince both Redi–Flo and Meenan are ... insured under the policy,

the court does not perceive the value of the distinction [between Redi–Flo's liability and that of Meenan]." This analysis, however, overlooks the fact that Meenan seeks redress as an independent insured under the Liberty policies.

occurrence. The above [pollution] exclusion clarifies this situation so as to avoid any questions of intent. Coverage is *continued for pollution or contamination caused injuries where the pollution or contamination results from an accident....*

*Id.* at n. 1 (emphasis in original) (citing statement by Insurance Rating Board quoted in Hurwitz & Kohane, *The Love Canal—Insurance Coverage for Environmental Accidents,* 50 Ins.Couns.J. 378, 379 (1983)).

*Broadwell* goes on to elaborate what is almost certainly the governing standard by which the terms "expected" and "intended" are measured under New Jersey law:

[D]ecisional law in New Jersey and elsewhere has tended to interpret the pollution exclusion and, more particularly, the "sudden and accidental" exception, as "simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the injury was 'neither expected nor intended.'" It is a reaffirmation that coverage will not be provided for expected and hence avoidable results.

We agree with this analysis. In our view, the pollution exclusion focuses upon the intention, expectation and foresight of the insured. If an insured knows that liability incurred by a foreseeable polluting event is covered by his policy, he is tempted to diminish his precautions and relax his vigilance. Conversely, we perceive no sound basis anchored in the policy language which requires prescience or clairvoyance on the part of the insured. Where the insured has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen, we are of the view that the "sudden and accidental" exception to the exclusion is applicable and the loss is thereby covered by the policy.

528 A.2d at 85–86 (citations omitted). This standard attempts to fix the meaning of "expectation" somewhere between, on the one hand, the foresight of predictable but largely unavoidable breakdowns against which insurance is purchased and, on the other hand, the foreknowledge of particular problems that may be addressed and their consequences avoided. *See Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394, 401 (D.N.J.1987); *Summit Associates v. Liberty Mutual Fire Insurance Co.,* 229 N.J.Super. 56, 550 A.2d 1235, 1239 (N.J.Super.Ct.App.Div.1988); *Broadwell,* 528 A.2d at 85–86; *Jackson Township Municipal Utilities Authority v. Hartford Accident and Indemnity Co.,* 186 N.J.Super 156, 451 A.2d 990, 994 (N.J. Super.Ct.Law Div.1982); *Lansco, Inc. v. Department of Envtl. Protection,* 138 N.J. Super. 275, 350 A.2d 520, 524 (N.J.Super. Ch.Div.1975), aff'd 145 N.J.Super. 433, 368 A.2d 363 (N.J.Super.Ct.App.Div.1976), cert. denied 73 N.J. 57, 372 A.2d 322 (1977). A few cases, of uncertain weight or authority, have suggested slightly narrower standards for "expected or intended." *See, e.g., Owens Illinois v. United Ins.,* Docket No. C 5045–84 (N.J.Super.Ct.Ch.Div. April 6, 1990) (stenographic transcript) (discussing and approving trend in caselaw away from "should have known" standard towards more narrow "actually expected" construction); *J.T. Baker, Inc. v. Aetna Casualty & Surety Co.,* No. 86–4794 (D.N.J. February 14, 1989) (Magistrate's Opinion and Order) (eschewing construction of "expected" that bars coverage of foreseeable, although unforeseen, harm or of harm caused by failure to take precautions, and proposing subjective "actually intended or expected" standard), aff'd by Order dated April 28, 1989 (Brotman, J.).

The record concerning Redi–Flo's knowledge plainly establishes that Redi–Flo had foreknowledge sufficient, under either of these two standards, to render the leakage of oil and the consequent environmental damage "expected" as that term applies to both the "occurrence" clause and the pollution exclusion. Redi–Flo was, from an early point, well aware that the Redi–Flo storage and distribution system represented a highly unstable asset. By 1972, Redi–Flo could not account for nearly 200,000 gallons of oil, the bulk of which was apparently lost in the approximately ninety leaks, mostly minor, that Redi–Flo had at that

time already experienced. This problem of leakage continued, notwithstanding various efforts to maintain, repair and augment the anticorrosion system (the so-called "cathodic system"), until the facility was finally shut down by Meenan following the 1983 spills. More importantly, a parade of inter-office memoranda and consultants' reports dating from the mid–1970's forward warned of systemic problems, of the substantial risk of future spills and of Hess's large exposure to environmental liability. A number of these advised replacing, selling or, if possible, shutting down the system, and Hess pursued variously all these options until it literally paid Meenan $150,-000 to take Redi–Flo off of its hands.

In August of 1976, for example, Stanley Orczyk—then an assistant to Norman Goldberg who was an officer of both Hess and Redi–Flo—received a memorandum urging that "serious consideration be given as soon as possible to disposing of or eliminating the operation of this system." Attached to that memo was a report by E.W. Sapp, a Hess engineer, detailing the results of an inspection of a wood bulkhead that intercepted spilled Redi–Flo oil flowing from the ground into a small creek. That report contained dire warnings concerning the risks posed by the facility and by the oil already in the ground.

As long as oil is in the soil and works its way to the stream, the chances of having an oil spill occurrence remain high. We should certainly keep someone in management informed that a potential oil spill into the small stream is a real possibility. Oil could be leaking from the various lines into the soil and saturating the ground. This oil will lay on the top of the ground water, move with the ground water, and by the time it is noticed be the potential for an extensive problem.

. . . .

In conclusion, the potential for future problems relating to this system exist. Since we have no satisfactory means to check for possible leaks, we must recognize the position we are in. The dike and sump system installed is a stop gap arrangement at best, and does nothing to the system itself. The system as it is

now could be a future headache of extensive proportion. The alternates are limited and not inexpensive. Management should continue to closely monitor the operation and be aware of the potential for problems in the future.

Orczyk discussed the memoranda with Mr. Goldberg and recommended replacing the system with tanks located at individual homes. In February of 1977, Hess actually produced a divestiture analysis concerning Redi–Flo that examined the options of continued operation, sale of stock, sale of assets, and replacement of the system with individual tanks. The analysis suggested, notably, that the sale of stock could be facilitated by "a $100,000 escrow account ... to cover future oil spills."

Similarly telling is an October 30, 1980 memorandum addressed to Phillip Kramer, President of Redi–Flo, that presents the report of yet another inspection of the Redi–Flo facility.

1. It is recommended that preparations be made to replace the present system.

. . . .

15. The system is not provided with alternate routing so that, in the event of a major event with resultant separation of main line piping, approximately 1200 homes would lose their source of heat.

16. The author knows of no method of satisfactorily identifying leaks, or source of leaks, in this system until sufficient oil has been lost to create an odor or be flushed with ground water to an open ditch. A pin hole leak, then, may go undetected for several weeks.

. . . .

18. It is understood the state regulatory agencies and the EPA are taking an active interest in the system, exposing the Company to punitive fines.

A memorandum dated January 21, 1981 to Stone and Webster, a consulting firm, further advised that "[t]he present system has multiple leaks which cannot be identified" and that "[f]uel oil which has leaked from the system has infiltrated the sub-soil and

bleeds continually into emerging ground water."

Redi–Flo also knew the reason for the persistent leaking. Norman Goldberg, Redi–Flo's senior vice-president during the period immediately prior to the acquisition, received a report in 1981 from the head of Hess's engineering department indicating that the environment was "extremely hostile" to the underground pipes, so much so that the system, the report concluded, had to be abandoned or removed—an analysis that was confirmed years later by Mr. John Storb, a Meenan consultant. In addition, Edward Holden—a cathodic specialist who examined the Redi–Flo system—testified that test station readings showed that the entire cathodic system had been inoperative for the nearly six years running from December of 1975 through October of 1981. Redi–Flo, in fact, knew that the system provided either no protection or incomplete protection for substantial periods of time throughout the life of the Redi–Flo facility, including the early five or six years of its installation and for some time directly before the Meenan purchase. Subsequent cathodic protection could do nothing to remedy the damage occurring during those lapses.

Meenan and Redi–Flo's post-acquisition directors were, moreover, put on notice of Redi–Flo's problems. Prior to the purchase of Redi–Flo, Mr. Carl N. Wallnau, Jr.—a Meenan vice-president—physically examined the Redi–Flo facility as part of Meenan's investigation of the subsidiary's operations. Mr. Wallnau related his findings to Stanley Orczyk, who by that time had left Hess and who served as a Meenan officer closely involved with the Redi–Flo purchase. Mr. Orczyk became a director and vice-president of Redi–Flo after the purchase was consummated. In those reports, Mr. Wallnau warned Mr. Orczyk on at least two separate occasions of leakage problems.

In a memorandum dated September 29, 1981, Mr. Wallnau reported that the cathodic system had not been maintained and was accordingly not providing corrosion protection, and that Redi–Flo "could expect

leaks at any time" if there were any breaks in the coating on the underground pipes. An earlier mid-September memorandum promised future leakage in still more certain terms. Wallnau reported that:

[w]hile the system is apparently stable, the thin wall conduit is not—and every home is tied into the system with this type of conduit. This would be an ongoing problem of leak containment since the tubing is corroding from the inside of the pipe.

... On the near term, I believe you will find environmental degradation on a spot basis as the coating on the pipe is bound to have knicks [sic] or scratches from ground movement or heavy traffic.

Mr. Wallnau commented further that "we have knowledge now that the thin wall tubing is leaking."

These apprehensions are reflected, among other places, both in a letter from the President of Meenan to the Hess Corporation presenting a purchase offer for Redi–Flo and in a Proposal Summary/Fact Sheet produced by Meenan prior to the purchase of Redi–Flo's stock. The letter, following the recommendation of Stanley Orczyk, explicitly and prominently requested indemnification against liability related to oil spills. The purchase offer had two principal components: First, it offered to purchase Redi–Flo for $20,000 cash. Second, it conditioned Meenan's purchase offer upon Hess's agreement to share the burden of "all system leak, breakdown and liability expense" in excess of specified amounts. Hess declined the offer, but returned to Orczyk with a counterproposal that was eventually accepted by Meenan—namely, Hess would pay Meenan $150,000 to take Redi–Flo off its hands. The Proposal Summary/Fact Sheet further expressed these fears, indicating that "this operation is fifteen years of age and can be expected to experience leak problems and other high cost breakdowns. Cost exposure here in terms of repair could be significant...."

Stanley Orczyk, who initially had resisted the purchase of Redi–Flo and who then had proposed the indemnification provision, was very much a party to these concerns. Oth-

er Meenan-era officers and directors were similarly alerted to Redi–Flo's precarious condition. One version of the November, 1982 letter by which Arthur Moller resigned as Redi–Flo's president contained a peculiarly stark expression of the prevailing sentiment.

I recommend that Meenan Oil divest itself of all interests in Redi–Flo Corporation. The pipe network has approximately five years life left. There has [sic] been numerous leaks already detected in the network system. The system is a disaster waiting to happen. I suggest that our first alternative is to find a buyer. If none can be found, I would then suggest that we look into the feasibility of installing two seventy-five gallon tanks along the sides of the houses. Another option, if legally possible, is to close down the system completely and disband it.

On these facts, it is clear that Redi–Flo was keenly aware of the substantial and immediate risk that the underground storage and distribution system posed to the surrounding environment. Redi–Flo knew that its system leaked, that it had always leaked, and that it would continue to leak. Redi–Flo was cognizant of its inability to detect spills before the oil actually surfaced and of the environmental hazard that inability represented. Redi–Flo was aware of the hostility of the environment to the underground storage and distribution system, it knew that the cathodic mechanism was inoperative for extended periods of time, and it had been warned that the system was steadily corroding. And both Redi–Flo and its stockholders had been urged repeatedly by their employees and officers to discontinue use of the system because of the imminent threat of an environmental incident.

Redi–Flo, in fact, does not seriously contest the conclusion that its knowledge of the facility's problems, before and after the Meenan acquisition, suffices to render the spills "expected" and to exclude Redi–Flo's cleanup costs from coverage under the Liberty policies. Instead, Meenan and Redi–Flo argue that it is improper and inequitable to impute Redi–Flo's pre-acquisition knowledge to its post-acquisition incarnation and that there are material issues of fact as to whether Redi–Flo's post-acquisition knowledge is sufficient to preclude coverage under the Liberty policies. Those arguments, however, rely on fundamentally flawed legal analyses, notwithstanding Magistrate Caden's finding that one of the arguments concerning attribution of Redi–Flo's pre-acquisition knowledge "would appear sufficient to raise a triable issue of fact."

Meenan and Redi–Flo argue that it would be inequitable to charge Redi–Flo with knowledge possessed by pre-acquisition Redi–Flo and never actually passed on to the post-acquisition officers and directors. Meenan and Redi–Flo point out, in this regard, that virtually all Redi–Flo's Hess-era employees resigned on the January, 1982 closing date. That argument, however, is unpersuasive. The acquisition of Redi–Flo was structured as an ordinary stock purchase. Meenan simply purchased one hundred percent of the stock of the Hess subsidiary, maintaining the corporation without interruption as a distinct entity under its prior name. The Redi–Flo operation continued as before. Consequently, the knowledge Redi–Flo had acquired during the years of Hess ownership was not erased by Meenan's purchase of Redi–Flo's stock. *See Department of Transportation v. PSC Resources, Inc.,* 175 N.J.Super. 447, 419 A.2d 1151, 1154 (N.J.Super.Ct.Law Div.1980) ("Where a corporation is acquired by the purchase of all of its outstanding stock, *the corporate entity remains intact* and retains its liabilities, despite the change of ownership) (emphasis added). The process of acquisition simply does not sanitize the acquired corporation, notwithstanding either the fact that it has gained new owners and fresh management or the presence of hardships associated with purchasing a business that brings with it greater liabilities than previously anticipated.

Meenan and Redi–Flo protest that such an analysis confuses the issue of constructive knowledge with that of corporate liability. They contend that the cases and

arguments cited by Liberty to this effect support only the uncontested proposition that the stock transfer did not extinguish Redi–Flo's liability for Hess-era events, and that these cases and arguments are inapposite to the "unrelated" issue of Redi–Flo's constructive knowledge. Yet, Meenan and Redi–Flo fail to indicate any compelling policy reason why the rule for imputation of knowledge should be different from that for imputation of liability. Although they intimate that the sole purpose for the development of the former rule is "to protect innocent third parties who have given notice through a subsequently departing agent," *see* Surreply in Further Opposition to the Motion of Liberty Mutual Insurance Company for Summary Judgment and Reply in Support of their Cross–Motion for Partial Summary Judgment at 7–8 (citing 3 N.Y.Jur.2d *Agency & Independent Contractors* § 260 (1980)), they fail to substantiate that proposition. The formulation that they suggest for the underlying principle is neither definitive nor exclusive, speaking only to fact patterns in which the party that relies upon the corporation's knowledge and the party that confers the knowledge are one and the same. In fact, both New York Jurisprudence and the case of *Stanley v. Chamberlin*, 39 N.J.L. 565 (1877), also cited by Meenan and Redi–Flo, offer alternate expressions of the rule's rationale. New York Jurisprudence explains that "the reason for the rule that notice to the agent is imputed to his principal rests upon the assumption that an agent will discharge the duty which he owes his principal by fully, fairly, and honestly disclosing all material facts which come to his knowledge or attention." 3 N.Y.Jur.2d § 260.[2] *Stanley v. Chamberlin* offers an even more compelling rationale for the rule of agency that further undercuts the narrow view taken by Redi–Flo and Meenan. There the New Jersey Supreme Court observed that "it is well settled that, as between two innocent parties, public policy requires that the principal must bear the loss occasioned by the act of his servant." 39 N.J.L. at 567.

Meenan and Redi–Flo also overlook the fact that corporate liability is often based upon knowledge and, more importantly, that the question of corporate knowledge, when raised, is almost never an end in itself but is instead almost always intertwined with a larger examination of corporate rights and obligations. See, e.g., *Mechanics Bank v. Seton*, 26 U.S. (1 Pet.) 299, 7 L.Ed. 152 (1828) (imputing knowledge of former president and directors to bank for purposes of evaluating bank's obligations to transfer stock); *Acme Precision Prods., Inc. v. American Alloys Corp.*, 422 F.2d 1395 (8th Cir.1970) (imputing knowledge of former employees to corporation as part of examination of alleged Sherman Act violation); *R–T Leasing Corp. v. Ethyl Corp.*, 494 F.Supp. 1128, 1135–38 (S.D.N.Y.1980) (imputing to company knowledge of former president for the purpose of determining rights under intercorporate lease). Indeed, denial of recovery even in the present case is not predicated simply on Redi–Flo's knowledge that the facility posed an immediate threat to the environment, but rather on Redi–Flo's failure to take "reasonable precautions" in response to that knowledge. *See Broadwell Realty Services v. Fidelity & Casualty Co.*, 218 N.J.Super. 516, 528 A.2d 76, 86 (N.J.Super.Ct.App.Div.1987) ("Where the insured has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen, we are of the view that the "sudden and accidental" exception to the exclusion is applicable and the loss is thereby covered by the policy.").

One of Redi–Flo's alternative "attribution" arguments appears to recognize that the issue of knowledge is, in fact, merely an adjunct to the central evaluation of the culpable conduct of the knowing party.

---

**2.** The same source cites several decisions that, like the present one, impute to principals knowledge of events and conditions acquired by their agents but not specifically transmitted by the complainant or defendant third party. Id. at 83 n. 17 (citing, e.g., *Bowers v. City Bank Farmers Trust Co.*, 282 N.Y. 442, 26 N.E.2d 970 (1940); *Woolverton v. Fidelity & Casualty Co.*, 190 N.Y. 41, 82 N.E. 745 (1907); *200 E. End Ave. v. General Elec. Co.*, 5 A.D.2d 415, 172 N.Y.S.2d 409 (N.Y.App.Div. 1st Dept.1958), aff'd 6 N.Y.2d 731, 158 N.E.2d 508, 185 N.Y.S.2d 816 (1959)).

Redi–Flo contends that knowledge gained by Hess-era officers and directors of Redi–Flo should not be imputed to the post-acquisition Redi–Flo because the officers and directors *acted* adversely to Redi–Flo's interests. In support of their view, they cite the contention of various insurers that despite mounting evidence of impending disaster, Redi–Flo's officers and directors failed to shut down and replace the underground storage and distribution system at Holiday City.

> [I]f the facts alleged by the insurers are true, then they clearly demonstrate that the persons responsible for Redi–Flo's operations prior to 1982 did not act in the interests of the Redi–Flo [sic], and, as such, Redi–Flo cannot be held accountable for their knowledge.
>
> The story told by Meenan's insurers is one of blatant dereliction of duty by Redi–Flo's Hess-appointed agents. If this story is believed, those agents chose to ignore the mounting evidence that Redi–Flo was headed for environmental and financial disaster simply because Hess did not wish to implement any remedy.

Memorandum in Opposition to the Motion of Liberty Mutual Insurance Company for Summary Judgment and in Support of Cross–Motion for Partial Summary Judgment at 78–79. Redi–Flo and Meenan argue that because the pre-acquisition directors and officers pursued the interests of Hess in derogation of Redi–Flo's own interests, the knowledge they acquired during this period should not be attributed to Redi–Flo.

This argument, however, misapprehends both the rationale underlying the adverse interest exception to the rules of agency and its application to Redi–Flo's circumstances. In *United States v. 141st Street Corp.*, 911 F.2d 870 (2d Cir.1990), the Court of Appeals explained that "as a general rule, the knowledge of an agent who acts adversely to his principal is not imputed to the principal on the theory that the agent has no incentive to inform the principal of his knowledge." *Id.* at 876. In the present case, no such disincentive existed because Redi–Flo and Hess had consonant views

regarding the remedy of Redi–Flo's problems. It is undisputed that the project of replacing the underground system, while ultimately necessary, was very bitter medicine for both Redi–Flo and Hess. The great expense of replacing the facility was one that the unprofitable Redi–Flo could ill afford, and it was an undertaking that Hess was reluctant to finance. Both Hess and Redi–Flo were fully apprised of the risks and rewards of their decisions.

Moreover, Meenan and Redi–Flo fail to establish that the Hess-era officers and directors were acting in a manner adverse to their obligations as agents of the corporate principal. Meenan and Redi–Flo do not assert that the officers and directors were acting for their own interests or that of an unrelated third party. Meenan and Redi–Flo charge, at most, that these agents were acting in the interest of Redi–Flo's sole stockholder. Actions by officers or directors for the benefit of all stockholders are, however, fully consistent with the proper discharge of the duties of corporate agents. *See Pomeroy v. Simon*, 17 N.J. 59, 110 A.2d 19, 22 (1954) ("[T]he directors of a private corporation are yet considered in equity as bearing a fiduciary relation to the corporation and its stockholders.... They are Quasi trustees for the stockholders."); *Berkowitz v. Power/Mate Corp.*, 135 N.J.Super. 36, 342 A.2d 566, 571 (N.J. Super.Ch.Div.1975) ("Those who control the affairs and conduct of a corporation, whether public or private, have a fiduciary duty to all the stockholders and the powers they have by virtue of their majority status are powers held by them in trust."); *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N.Y. 185, 123 N.E. 148, 151 (1919) ("Equity ... recognizes the truth that the stockholders are the proprietors of the corporate interests and are ultimately the only beneficiaries thereof. Those interests are ... intrusted, through the corporation, to the directors, and from that condition arises the trusteeship of the directors with the concomitant fiduciary obligations.").

Simply put, the decision to keep the system operating in the face of knowledge that it was bound to cause serious environ-

mental harm in the near term is one of the kind for which corporations assume responsibility. While that decision may have been reprehensible from the vantagepoint of the public interest, it represented a business judgment that at the time was not inconsistent with the interests of Redi–Flo and its sole shareholder. It does not afford a basis for relieving Redi–Flo of the legal consequences of the knowledge and actions of its officers and directors.

Meenan and Redi–Flo further argue that pre-acquisition Redi–Flo was not an independent entity and that the "legal fiction" of Redi–Flo's separate existence from Hess should be disregarded. While this suggestion has some appeal, given the number of Redi–Flo operational functions that were discharged by (non-Redi–Flo) Hess personnel, it also fails as a matter of law.

Meenan and Redi–Flo do not question Redi–Flo's pre-acquisition status as a separate entity for purposes of determining corporate liability. Similarly, they do not set out their consolidation analysis with the object of imputing to Hess the knowledge gained by Redi–Flo's officers and directors during the Hess era. Thus, Meenan and Redi–Flo do not assert that Meenan's stock purchase should be regarded as an asset purchase or as the formation of a *new* independent subsidiary. In fact, they expressly affirm Redi–Flo's liability for all pollution damage at Holiday City. Meenan and Redi–Flo choose instead to apply their "piercing" to a novel end. They invoke the doctrine of "piercing the corporate veil" solely to argue that all inculpatory pre-acquisition knowledge should be *erased* from Redi–Flo's collective memory.

Such a use of "piercing" is without precedent. The concept of piercing the corporate veil is properly invoked to *extend* the reach of liability and, perhaps, imputed knowledge to a controlling corporation or individual. *See* H. Henn & J. Alexander, Laws of Corporations and Other Business Enterprises § 146, at 346 (3d ed. 1983 & Supp.1986) ("Corporate privileges—such as limited liability—vanish whenever corporateness is disregarded."); *see also Acme Precision Prods., Inc. v. American Alloys Corp.*, 422 F.2d 1395, 1397–98 (8th Cir. 1970) (implying that knowledge of subsidiary, under specified conditions, may be imputed to parent). Meenan and Redi–Flo offer no support in the case law for a rule that utilizes corporate consolidation for the purpose of absolving the subsidiary of the legal consequences of either its acts or of knowledge it plainly held.

Meenan and Redi–Flo also rest their argument on the intimation that this "piercing" is required to " ' "achieve equity." ' " *See* Memorandum in Opposition to the Motion of Liberty Mutual Insurance Company for Summary Judgment and in Support of Cross–Motion for Partial Summary Judgment at 73 (citing *Walkovsky v. Carlton*, 18 N.Y.2d 414, 223 N.E.2d 6, 7, 276 N.Y. S.2d 585, 587 (1966) quoting *International Aircraft Trading Co. v. Manufacturers Trust Co.*, 297 N.Y. 285, 79 N.E.2d 249 (1948)). Yet, it is hardly clear that the equities favor Meenan, which seeks to don the cloak of the abused and innocent purchaser. One of the reasons, presumably, that Hess and Meenan structured the transaction as a stock purchase and that they maintained Redi–Flo as an independent corporation was to insulate themselves from Redi–Flo's liabilities. Both exploited Redi–Flo's independence and continuity for their own gains. They may not now be heard to complain of the consequences of that continuity. Moreover, Meenan did not undertake the purchase blind to the environmental risks that it might be assuming. In fact, Meenan and Stanley Orczyk (the one-time assistant to Redi–Flo's vice-president) specifically sought indemnification against liability for oil leaks as a condition of the initial purchase offer. Although they were unable to win the indemnification provision in subsequent negotiations, they did obtain a $170,000 concession from Hess that both eliminated the proposed $20,000 payment by Meenan for the Redi–Flo facility and included a $150,000 payment from Hess to Meenan.

Meenan's claim of "inequity" is further undermined by the fact that Meenan-owned Redi–Flo believed that small, undetected pipeline leaks were not considered "sudden

and accidental" and, consequently, not covered by the Liberty policies. In August of 1981, Craig N. Gass—a Meenan officer and later the president of Redi–Flo—wrote a memorandum to George Leibowitz—a Meenan officer who was appointed director, vice-president and treasurer of Redi-Flo directly following the acquisition—in which Mr. Gass discussed the scope of Meenan's insurance coverage. He there suggested that the comprehensive general liability policies maintained by Meenan (including the Liberty policies) did not cover "losses occurring on a non sudden and accidental basis (e.g. undetected tank or pipeline leaks)." Furthermore, that view apparently underlay the negotiations toward a settlement for *all* the cleanup costs related to the 1982 spill which took place between Meenan and Great American Surplus Lines Insurance Company ("GASLIC") (now known as American Empire Surplus Lines Insurance Company) during the early months of 1983. GASLIC maintained not a comprehensive general liability policy but rather an environmental impairment liability policy that specifically covered non-sudden pollution.

While Meenan and Redi–Flo's beliefs in this regard are not determinative (notwithstanding the holding in *Diamond Shamrock*, No. 3939–84 at 27–29 (N.J.Super.Ct. Ch.Div. April 12, 1989), suggesting otherwise), they do undercut any contention that it is somehow unjust to Meenan, as the sole shareholder of Redi–Flo, to deny Redi–Flo recovery against Liberty Mutual. Indeed, the unfettered dictates of justice would require still more—not only that recovery against Liberty be denied but that both Meenan and Hess, the corporate parents of Redi–Flo, bear the financial cost of the cleanup. The system truly was "a disaster waiting to happen." Hess knew that fact but chose to sell the Redi–Flo facility rather than replace it or shut it down. Meenan at the very least suspected that fact, but preferred to await the disaster rather than assume the considerable expense of avoiding it. Under these circumstances, there is no reason to strive to avoid the force of the settled principles of corporate and agency law to find coverage under the Liberty policies.

## CONCLUSION

Liberty's motion for summary judgment against Meenan and Redi–Flo is granted. Because both the pollution exclusion and the "occurrence" clause place these leaks outside the coverage of the Liberty policies under New Jersey law, it is unnecessary to reach the other issues raised by Liberty in its motion or by Meenan in its cross-motion.[3]

SO ORDERED.

---

**3.** The foregoing discussion has been premised on the assumption that the law of New Jersey is the governing law of this case. That assumption was not shared by all parties, and the parties have, as a result, briefed the choice of law issue exhaustively. Liberty, which is incorporated in Massachusetts and maintains its principal place of business there, argues that New York law applies. Redi–Flo, a New Jersey corporation, argues that New Jersey law applies. There is no need, however, to engage in an extensive choice of law analysis, even if there is an apparent conflict of laws, because Liberty's argument for the application of New York law is without merit and because Liberty prevails under New Jersey law—the law for whose application Meenan and Redi–Flo correctly argue.